**Kim BROWN and Pete Petersen o/b/o Todd Petersen, deceased**

v.

**HAMILTON COUNTY, Tennessee.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

June 30, 2003 Session.

Aug. 19, 2003.

Permission to Appeal Denied by Supreme Court Jan. 26, 2004.

year after Oakland filed its complaint

Jeffrey W. Rufolo and Thomas Greenholtz, Chattanooga, Tennessee, for Appellants.

R. Dee Hobbs, Office of Hamilton County Attorney, Chattanooga, Tennessee, for Appellee.

HERSCHEL PICKENS FRANKS, J. delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

## OPINION

Action filed pursuant to the Governmental Tort Liability Act was dismissed on the grounds defendant's acts were planning/discretionary functions and immune. Also Public Duty Doctrine barred recovery. We reverse and remand.

In this action filed pursuant the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn.Code Ann. § 29–20–201, *et seq.*, the Trial Court ruled in favor of the County, and plaintiffs have appealed.

The Trial Court ruled that the acts on behalf of the County were discretionary functions rendering the County immune, and further ruled that there was no evidence that the defendant "acted with intent, malice or reckless conduct" to take this case out of the public duty doctrine.

The Trial Court made these findings of fact:

Evay Kelley appeared in Hamilton County General Sessions Court in June of 1997 on charges of felonious possession of a weapon and felonious possession of cocaine with intent to distribute. Kelley had a history of two prior charges of carrying a dangerous weapon. Though felony charges, the murderer Kelley, was placed with the Hamilton County Misdemeanant Program to await trial. He was fitted with an ankle bracelet and his whereabouts were to be monitored on a twenty-four hour a day

basis. Through many hours of testimony in this cause, it became apparent that Kelley violated house arrest on many occasions for hours at a time and sometimes overnight. Though he was warned several times by the County employee, Glen Brown, who supervised his release pending trial, Mr. Kelley's house arrest was never revoked until a day before the senseless tragedy of August 8, 1997. In the early morning hours of August 8, 1997, Evay Kelley, while in the company of friends, gunned down Todd Peterson in a random act of brutality and callousness.

The evidence does not preponderate against these fact findings, Tenn. R.App. P. 13(d).

Local governmental entities are immune from suit except when the General Assembly has, by statute, explicitly permitted them to be sued. *Fretwell v. Chaffin,* 652 S.W.2d 755, 756 (Tenn.1983). Before proceeding in an action against a governmental entity, the threshold issue of waiver of governmental immunity must be addressed. The GTLA provides in pertinent part:

§ 29–20–205. **Public officers and employees; negligent acts or omissions:** Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:

(1) the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;

Discretionary functions that are immune from liability are not defined in the GTLA. In *Bowers v. City of Chattanooga,* 826

S.W.2d 427 (Tenn.1992), the Supreme Court announced what is now known as the "planning operational test" to determine whether a particular act is discretionary and therefore immune from liability. The *Bowers* decision teaches at p. 431:

A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules.

On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." (Citation omitted).

The Trial Court seemed to base its finding on its conclusion that Brown "had no manual to which to refer, and little to no supervision". She also noted from his testimony, that the guidelines for the misdemeanor program formulated for the Coun-

ty had not been adopted and "the program was fashioned more or less on an 'as-you-go' basis" following the orders of Sessions Court. The Misdemeanant Community Corrections Program was drafted in 1990, but was rejected by the judges and assistant district attorneys as too slow and cumbersome. They never adopted a formal written program. Nevertheless, the Order actually used by the Court to assign participants to the program as it evolved is virtually identical to the plan proposed by Wright, Superintendent for the Hamilton County Misdemeanant Community Corrections Program. Wright testified that the pre-trial program was developed in an ad hoc manner by the judges and district attorneys, but the program was not originally designed to apply to persons charged with felonies. "As they [the courts] needed something, we adjusted to that degree." His staff had no say in accepting or rejecting the people sent to the program by the courts, and their task was to implement and administer what had been formulated by higher-level policy makers. He observed, "At the program level, we have no say in it."

Brown essentially testified that his primary job responsibilities included processing people into the program and orienting them to its terms and conditions, fit participants with ankle bracelets, set up equipment, and monitor their compliance. Noncompliance by leaving the house without permission, would be a violation of the program, and the staff was required to meet weekly, face to face with participants to review compliance.

A further duty was to monitor computer printouts detailing residents's activity, verify and document approved absences, cross-check data, and otherwise be responsible for knowledge of participants' whereabouts at all times, and the participants were to be employed or actively seeking

work. Also, the staff would initiate and request issuance of a capias to apprehend and incarcerate violators.

Among the exhibits offered in evidence is a document "Pretrial Resident" on the County letterhead with "Misdemeanant Community Corrections Program" printed in the upper right margin. A sub-caption is headed "Behavioral Contract." It states in pertinent part: "Misdemeanant Community Corrections Program agrees: 1. To report to the court on [Evay Kelly] attitude and behavior. 2. To remove [Evay Kelly] from the program for misconduct." Accordingly, the staff was aware of its affirmative duty to remove Kelly from the program for his misconduct. Clearly these rules or regulations were in existence, and Brown was performing operational tasks. There is no evidence in the record that Brown had the authority to design or modify the rules and regulations. His duty was to enforce the terms as laid out, i.e., to administrate a program that had been designed at a higher level.

█ The decision to place Kelly in the program was made by a judge, and was a planning, discretionary decision and therefore immune. No one charged with the day-to-day operation of the program had input or authority on what individuals were assigned to the community corrections program. Once the decision was made, how it was carried out, what the site supervisors were to do to implement that planning decision, were operational in nature. Decision making and the use of judgment is not synonymous with discretion for purposes of immunity. *Bowers; Doe v. Coffee County Bd. of Educ.*, 852 S.W.2d 899, 906–907 (Tenn.Ct.App.1992).

█ Actions may be operational in nature even in the absence of a specific policy or procedure. It is well-settled that an act or omission is considered operational and immunity is removed either when: (1) the conduct occurs in the absence of a formulated policy guiding the conduct or omission; or (2) when the conduct deviates from an established plan or policy. *Chase v. City of Memphis*, 971 S.W.2d 380, 384 (Tenn.1998); *Matthews v. Pickett County*, 996 S.W.2d 162, 164 (Tenn.1999). As the *Bowers* Court observed at page 433:

> We hold that where two governmental acts are concurrent causes of injury, one of which arises from a discretionary function, the other which does not, the exception to the removal of immunity contained in 29–20–205(1) does not apply.

For the foregoing reasons, we hold that the record does not support an exception to the removal of governmental immunity in this case.

█ The Trial Court also based her decision on the public duty doctrine. In *Ezell v. Cockrell*, 902 S.W.2d 394 (Tenn. 1995), the Supreme Court held that the common law doctrine of public duty and its exception, the special duty doctrine, survived the enactment of the GTLA. The public duty doctrine provides common law immunity to public employees for injuries caused by a breach of a duty owed to the public at large. *Id.* at 397. The public duty doctrine is an affirmative defense that arises after determining the issue of immunity under the GTLA. If the GTLA removes immunity, then the common law rule of immunity under the public duty doctrine provides an additional layer of defense and is the next level of inquiry for the court. *Chase.*

The County correctly observed in its brief that under the public duty doctrine, "a duty owed to everyone is a duty owed to no one." Thus, it is insisted, Defendant had no relationship with, nor duty to the victim, Todd Petersen. The doctrine applies to cases where either the government

had no reason to know a particular victim was in danger, or where the government had no reason to know a particular individual posed a threat, such as prisoners, the severely mentally ill, or a public employee with a known propensity for violence. *See generally, Cox v. State,* 844 S.W.2d 173 (Tenn.Ct.App.1992); *Hembree v. State,* 925 S.W.2d 513 (Tenn.1996). *Also see, Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73 (Tenn.2001).

This case is distinguishable from the mentioned authorities in that the Defendant already had Kelly under arrest with weapon and drug charges pending. He was not a random individual from the public happening to be out on the streets. The County, knowing he was charged with felonies, made the decision to place him in the program not designed for defendants charged with felonies, and then failed to follow up in its duty to adequately monitor him and enforce the terms of the house arrest. It was reasonably foreseeable that Kelly was an increasingly serious threat to society if he continued to violate the rules of the program by roaming the streets without any meaningful intervention by those responsible for monitoring him.

 There are three situations in which the public duty doctrine is inapplicable because it is nullified by the special duty exception. The special duty exception is applicable when:

(1) a public official affirmatively undertakes to protect the plaintiff and the plaintiff relies upon the undertaking;

(2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or

(3) a plaintiff alleges a cause of action involving intent, malice, or reckless mis-

conduct. *Chase,* 971 S.W.2d at 384; *Ezell,* 902 S.W.2d at 402.

The parties agree that the first two grounds of the exception are inapplicable to facts in this case. Plaintiffs argue that the defendant's actions were reckless misconduct, that the special duty exception defeats the public duty doctrine and removes immunity for the defendant's actions. Whereupon, plaintiffs would be permitted to proceed under the negligence standard as set forth in the GTLA. In this connection *see, Matthews v. Pickett County.*

The Trial Court found that the public duty exception applied and that plaintiffs could not recover. She also ruled that plaintiff had not proved the third criteria for the special duty exception, i.e., intent, malice, or recklessness. However, the memorandum opinion states no specific fact findings relied upon by the Court, but only the generic statement that "after reviewing the evidence and the law, the evidence did not support Plaintiff's claim." This conclusion does not amount to a finding of fact on the issue.

 Reckless conduct is defined as taking place "when a person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Gardner v. Insura Property & Cas. Ins. Co.,* 956 S.W.2d 1, 3 (Tenn.Ct. App.1997). The evidence in the record compels the conclusion that defendant's implementation of the program with respect to Evay Kelley constituted a substantial and unjustifiable risk, such as the defendant's conduct is deemed reckless under the special duty exception. The staff did not know Kelly's employment status when he entered the program or at the time of the murder. No records of activi-

ty/whereabouts at all for June 5–8, June 16–23 and July 5–6 were available. Kelly was in violation of the program well over half of the fifty days involved before the murder. Grounds to revoke his status as early as July 1, one month before murder were present. Kelly was warned on the July 8 meeting, but there is no record verifying where he was. He was not asked his whereabouts during the unauthorized absences. There were over 32 absences unapproved, and at least 17 were not documented in any fashion. The policy was to revoke for any absence (permitted "not one single time"). At the time of the murder, there had been at least three overnight absences and no attempts were made to verify Kelly's accounts of where he was by talking with anyone, such as his mother or father to confirm his story. During the absence for approximately 48 hours before Petersen's murder, Brown called Kelly's house twice on August 6 and 7. No follow up or effort was made to locate Kelly when there was no response to the phone calls, and significantly, Kelly was never asked or checked about carrying a weapon, despite the charges against him.

The preponderance of evidence in the record points to extreme dereliction by the County in the operation of its program, and such neglect of duty substantially and unjustifiably increased the risk that harm would occur. The evidence supports findings of reckless misconduct and omissions sufficient to come within the exception to the public duty rule, and remove the defendant's immunity from liability for these actions.

 The issue thus becomes whether the plaintiff has shown the elements of a negligence claim under the GTLA as outlined in *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn.1997). The defendant overlooked thirty-two violations, completely un-

monitored Kelley for several days because equipment was out of operation, and in our view unreasonably accepted Kelley's excuses for absences and failed to insist upon documentation or make any reasonable attempt to verify his stories and take steps to remove Kelley from the program. Moreover, nothing was done when he was absent for overnight periods. While Brown had a heavy case load, he denied that the number of people impeded his ability to execute his job duties.

 On the basis of this negligence, the issue thus becomes whether it was a proximate cause of plaintiff's damages. Legal or proximate cause, is "a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient." *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn.1998). The three-pronged test for proximate cause is: (1) the conduct must be a "substantial factor" in bringing about the harm; (2) no rule or policy relieves the tort feasor from liability; and (3) the harm could have been reasonably foreseen or anticipated by a person of ordinary intelligence and prudence. *Haynes v. Hamilton County*, 883 S.W.2d 606, 611–612 (Tenn. 1994). Obviously, in this case Kelly was the "cause in fact" of Todd Petersen's death. The proximate cause of an injury is not required to "be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *Id.*

 It is not necessary that the precise manner of an occurrence be foreseeable; a particular harm need not be foreseeable if another harm of a like general character is reasonably foreseeable. *Moon v. St. Thomas Hospital*, 983 S.W.2d

225, 229 (Tenn.1998). This is true even if the event to be reasonably foreseeable is a criminal act. *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991).

The Supreme Court has recognized that drug-related offenses often create a threat of harm or serious bodily injury given the dangerousness of drugs such as cocaine, and the circumstances of drug transactions in particular. *State v. Ross*, 49 S.W.3d 833, 848 (Tenn.2001). Moreover, persons convicted of a drug-related felony which involves possession of a weapon, are ineligible for sentencing and participation in the Community Corrections Program of 1985 because they do not meet the criteria of Tenn.Code Ann. § 40–36–106(a)(4). As a matter of public policy, these criteria should be applied to persons charged with such offenses while awaiting trial. *See, State v. Grandberry*, 803 S.W.2d 706 (Tenn.Crim.App.1990).

The County's position on the issue of foreseeability is untenable. On the one hand they contend that it could not know, predict, or foresee that Kelly posed a high risk of violence. On the other hand, they concede he was an accused felon, and should never have been placed in the program. Clearly, if he was unsuitable for the program, it was even more reason to institute a heightened scrutiny and monitor him more intensely. Brown admitted that he was supposed to report violations on the first occasion they occurred and that detainees under house arrest could be very dangerous, and that unauthorized absences presented a "serious situation." However, the County insists that it was unforeseeable that this injury could result from any of its negligence. The very fact that monitoring certain persons and keeping them under house arrest was deemed necessary exposes the defendant's awareness that these individuals were unsuitable to be released into the community without supervision. They required electronic monitoring of their whereabouts because it was foreseeable that some harm might occur if they were left to their own devices. Under all the circumstances of this case, it was foreseeable that Kelley would commit this violent offense.

At trial, the County's counsel made a Motion for a directed verdict, and observed: "I would point out that you have heard from our chief witnesses already, so I'm not sure that we would have any proof beyond that which we have already offered." The Court then advised that she would take the "Motion" under advisement and said:

THE COURT: Well, let me first ask, Mr. Hobbs, did you have any other proof? I didn't mean to cut you off.

MR. HOBBS: No, Your Honor.

THE COURT: All right. Thank you. Go ahead.

The Motion counsel was actually making was pursuant to Tenn. R. Civ. P. 41.02(2), as there was no jury involved, and where a Court sustains such a motion, the sufficiency of the plaintiff's proof is challenged, and where the motion is granted it is based upon the law and evidence produced, with the effect that plaintiff has failed to demonstrate a right to the relief it is seeking. *City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d 734, 740 (Tenn.1977).

The record shows that defendant rested and declined to offer any further proof, and therefore this case came to us as having been tried to its conclusion. Accordingly, we hold that plaintiff is entitled to a judgment on the issue of liability and we reverse the Trial Court on this issue. The cause is remanded to the Trial Court to award reasonable damages to the plaintiffs.

The cost of the appeal is assessed to Hamilton County.