# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 17, 2013 Session

## BARBARA A. LYNCH, deceased, by her sister and next of kin, CELINE HAYES, ET AL. v. LOUDON COUNTY, TENNESSEE, ET AL.

### Appeal from the Circuit Court for Loudon County
### No. 2008-CV-239     Russell E. Simmons, Jr., Judge

_____

### No. E2013-00454-COA-R3-CV-FILED-DECEMBER 17, 2013

_____

In this wrongful death action, the plaintiffs alleged that after the deceased was involved in a single car accident, the investigating officer improperly allowed her to continue driving, resulting in her death when she had another wreck shortly thereafter. In the initial lawsuit, the defendants moved for summary judgment. The trial court found that the public duty doctrine applied and granted the motion. After the plaintiffs appealed, we held that under the public duty doctrine, disputed material evidence existed as to whether the officer assumed a specific duty to protect the deceased but then discontinued his aid and protection to her, thereby leaving her in a worse position than she was in before he intervened. We therefore reversed the summary judgment and remanded the case for further proceedings. *Lynch v. Loudon Cnty.*, No. E2010-02231-COA-R3-CV, 2011 WL 4952778 (Tenn. Ct. App. Oct. 14, 2011). Upon remand the trial court found that the special duty exception did not apply and the public duty doctrine was a complete bar to the plaintiffs' action. The court additionally concluded that Restatement (2nd) of Torts section 324 was not applicable and even if fault was compared, the fault of the deceased exceeded that of the officer by more than fifty percent. Accordingly, the trial court found that the claims of the plaintiffs must be denied. The plaintiffs again appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Joseph R. Ford and Ashley Harrison Shudan, Loudon, Tennessee, for the appellants, Barbara A. Lynch, deceased, by her sister and next of kin, Celine Hayes.

Arthur F. Knight, III, and Jonathan Swann Taylor, Knoxville, Tennessee, for the appellee,

Loudon County, Tennessee.

## OPINION

## I. BACKGROUND

Celine Hayes ("Sister") is the sibling of Barbara A. Lynch ("Decedent") (collectively, "the Plaintiffs"). Decedent died in the second of two single-car accidents that occurred on January 22, 2008. Thereafter, the Plaintiffs filed this action against Loudon County, Tennessee ("County"), and Deputy Bryan Blakney,[1] an employee of the Loudon County Sheriff's Department ("LCSD") (collectively, "the Defendants"), pursuant to the Tennessee Governmental Tort Liability Act ("GTLA"), Tennessee Code Annotated section 29-20-101, et seq. The Plaintiffs alleged that County was liable in negligence for the response to and investigation of Decedent's first accident by Deputy Blakney. In particular, they asserted that Deputy Blakney encountered a helpless Decedent, began rendering aid to her, but then abandoned the aid and left Decedent in a worse position than she was in when he found her.

At the time of her death, Decedent worked at Adult Community Training Center ("ACT") in Lenoir City, Tennessee. She had been employed there for two to three years. In January 2008, Decedent's shift at ACT was from midnight until 8:00 a.m., and her job duties were to sit with elderly and disabled individuals and care for them during the night. After her shift concluded, Decedent, described as a modest, hard working woman, normally drove home and slept.

The record reveals that Decedent had a medical history of anxiety and a sleep disorder. She had taken Xanax for at least ten years and Ambien for a number of years prior to the date of the accident.

When the day shift arrived on January 22, 2008, they discovered Decedent lying naked in a bed asleep. It appears that at some point during the night she had soiled her clothes. After obtaining a bathrobe, Decedent left ACT to drive home.

According to the record, the morning of the accident was cold and rainy and the roads were wet and icy in some spots. LCSD had its third shift (12:00 a.m. to 8:00 a.m.) work over into the day and the first shift was called in early. In addition, detectives and administrators were asked to go out on patrol and work accidents due to the weather. The opening of schools was delayed that morning. Due to the volume of accidents, officers were instructed

---

[1]On the day of trial, the Plaintiffs nonsuited the allegations of reckless conduct against Deputy Blakney, thereby removing him as an actual party.

to give "white forms" to drivers to submit to their insurance companies rather than complete standard accident reports on single vehicle, property damage only wrecks.

No one witnessed Decedent's initial accident that occurred about a mile from ACT at the intersection of Muddy Creek Road and Virtue Road. Shortly thereafter, Nola Thomas came upon Decedent's vehicle. Ms. Thomas stopped, walked over to Decedent's car, and spoke to Decedent through the partially-opened driver's side window. Ms. Thomas did not observe any injuries to Decedent, and Decedent informed her that she was uninjured. Ms. Thomas further did not notice any damage to Decedent's vehicle. Decedent related to Ms. Thomas that she needed assistance with her car. 911 was called by Ms. Thomas at approximately 9:08 a.m., at which time the dispatcher informed her there would be a delay as officers were working multiple accidents.

Shortly after Ms. Thomas hung up with 911, Decedent got out of her vehicle and stood beside it adjusting her robe. Ms. Thomas observed that Decedent "was kind of not real steady." While adjusting the bathrobe, Decedent revealed that she was naked underneath. Ms. Thomas told Decedent to get back into her car due to the cold. She continued talking with Decedent until the rain began to fall again, at which time she returned to her vehicle. Ms. Thomas related as follows in her deposition:

> I thought maybe she might want to call somebody so I got back out of my car. At this point I walked over to her passenger window and she rolled it down and she was digging through her wallet and she had money. She was just kind of laying it everywhere. And I said would you like to call somebody and I handed her my phone and she just kind of sat and looked at it[2] and that first threw me off and I said do you not know how to use a cell phone and she handed it back to me and I said would you like me to call somebody for you and she said my sister. Well, I said okay, what's the number and she just kept giving me different series of numbers. It was like she didn't have enough numbers or she had too many numbers. It was never a phone number. I tried dialing them in and then . . . I realized . . . okay, I got too many or I don't have enough . . . and I even tried a couple I think that were close to what she was saying and with no success and so then I asked her where she lived or where she was coming from . . . maybe I could go get somebody for her. At this point she's laying money everywhere and she's saying I don't know if I have enough money for the tow truck and she just really seemed, I'm thinking she can't give me a phone number, she can't use the phone, something is not right

_____

[2]Interestingly, Sister testified that Decedent had formerly worked at U.S. Cellular and knew all about cell phones.

and she couldn't tell me where she was coming from. I mean she never could answer me. I asked her where she was going. First she told me to the doctor. Then she told me to her sister's. I asked her, you know, where her sister lived. . . . I never got a response. I never got an actual answer to any of these questions.

Decedent invited Ms. Thomas to sit with her in her heated car, but Ms. Thomas declined. Due to their interaction, Ms. Thomas believed something was wrong with Decedent. Ms. Thomas testified that Decedent appeared to be "fidgety" – "at moments, [Decedent] would just kind of sit and stare off into space, nonresponsive . . . ." "When [Ms. Thomas] pulled up, [Decedent] was just kind of sitting there staring straight ahead." Ms. Thomas described Decedent as "sleepy. She was kind of just zoned out."

Deputy Blakney arrived at the scene at 9:21 a.m., approximately 13 minutes after the initial 911 call. Ms. Thomas stated she approached Deputy Blakney and told him that "something is not right" with Decedent. She informed him that Decedent could not provide a phone number or answer any questions asked of her. According to Ms. Thomas, Deputy Blakney walked over to talk with Decedent, who was still in her car. Ms. Thomas could not hear the conversation as she stood back away from Decedent's vehicle, but opined that the conversation was very short, "lasting just a couple of minutes and no more than three." While Ms. Thomas was present, Deputy Blakney never had Decedent exit her car and did not ask for her driver's license, proof of insurance, or registration. Ms. Thomas recalled that she asked Deputy Blakney if he was going to let Decedent go and he replied "probably not." Based on that, Ms. Thomas left the scene before the tow truck arrived.

Deputy Blakney testified that upon his arrival he went directly to the driver's side window of Decedent's vehicle. He did not refute Ms. Thomas's testimony – rather, he stated that he did not remember her being present at the scene. Deputy Blakney opined that the accident occurred when Decedent was trying to stop at the intersection of Virtue Road and Muddy Creek Road, but slid due to black ice across the road off the pavement.[3] He observed that Decedent "had the typical reaction of someone that had just been in an accident trying to figure out what exactly happened and I guess maybe shocked, I guess you could say was the expression that she had when I first walked up to her." Deputy Blakney found Decedent to be slightly shaken up but attentive, had no slurred speech, no dilated pupils, or bloodshot eyes, was steady on her feet, had no smell of alcohol, and was in no imminent danger. According to Deputy Blakney, while speaking with Decedent and watching her when she got out of the car to pay the tow truck driver, he observed that she was "clear, alert, conscious, clear speaking, had no problems walking or performing any functions." On multiple

_____

[3]Deputy stated he slid several times that day.

occasions, Decedent said she was not hurt and refused his offers to get her medical assistance. Deputy Blakney assessed the situation as a minor traffic accident with no damage to Decedent's car. He further testified that it was not unusual to find people driving at that time of day in pajamas or a robe if that person was not planning on being out of the car. Accordingly, Deputy Blakney asserted that he did not have reasonable suspicion or probable cause to ask Decedent to perform a field sobriety test, much less arrest her.

Deputy Blakney stated that he did not remember the exact amount of time he spent talking with Decedent. He did not recall asking her where she was coming from or if he checked her license, registration, or proof of insurance. He did not remember whether he got her name or address. When another deputy arrived at 9:26 a.m., he left Decedent and began speaking with that officer. Deputy Blakney acknowledged that dispatch records show he cleared the scene in approximately 19 minutes.

Deputy Blakney related that he was 25 years old and a certified police officer at the time of the accident. He had graduated from a law enforcement academy at Cleveland State Community College and was current on all of his in-service training. He was trained in DUI detection at LCSD and in prior positions at the McMinn County Sheriff's Department and the Chattanooga Housing Authority. On January 22, 2008, he had been with LCSD six to ten months.

John Malone, the owner of Malone's Wrecker Service, was summoned to the scene to assist Decedent. Mr. Malone testified that Decedent remained in her car and appeared to be fidgeting and pulling on her bathrobe. He recalled that the front tires of Decedent's vehicle were off the roadway and she was unable to back the car up. Mr. Malone observed that Decedent "never hit the guardrail" and there was no damage to her car. According to Mr. Malone, Decedent remained in her vehicle while he pulled it back onto the roadway. She was able to follow his directions in how to maneuver the car while he checked to ensure it was operable. Contrary to the testimony of Deputy Blakney that Decedent got out of her car to pay the tow truck driver, Mr. Malone stated that he never saw Decedent outside of her vehicle and she paid him by passing the money through the driver's side window.

According to Mr. Malone, since Decedent appeared shook up from the accident, he offered to tow her vehicle to her house or take her home and let his assistant drive her vehicle. Decedent, however, refused all offers of help from Mr. Malone and his assistant.[4] She told him she was alright and was going to drive her car home.

---

[4]Mr. Malone's assistant likewise testified that Decedent gave no indication that anything was wrong with her and that she never left the car during the towing service.

Mr. Malone noted that he has worked a number of wrecks during his towing career where he encountered intoxicated or drugged drivers. Acknowledging that he had stated in his earlier deposition that he knew "something was wrong" with Decedent, he related at trial that she did not appear to be impaired in any way and the comment referred to her fidgeting with the bathrobe. Mr. Malone testified that Decedent did not have slurred speech, did not repeat words, looked directly at him, reached into her purse to get an envelope, and correctly picked out two $20.00 bills – the correct amount – to pay for the towing service. In his opinion she did not need any medical assistance.

Once Decedent drove away from the first accident scene, Mr. Malone followed her. During the time he was behind her on Muddy Creek to Highway 11, she drove appropriately but a little slow (consistent with Sister's testimony about Decedent's normal driving habits). He observed that she stayed in the proper lane of traffic; properly stopped at the Highway 11 intersection; and put on her left turn signal and properly got into her lane of traffic on Highway 11. While Mr. Malone was waiting at the stop sign for oncoming traffic, Decedent drove out of his sight on Highway 11.

Mr. Malone did not witness the second accident that resulted in Decedent's death. The distance between the two accident scenes is approximately two miles. Her vehicle left the road and struck a utility pole. Mr. Malone called 911 regarding the second wreck at 9:49 a.m. According to Mr. Malone and his assistant, Decedent was ejected from her car. Her body from the waist up was discovered lying underneath the vehicle.

Jeff Vittatoe, an investigator for LCSD at the time of the accident, testified that an officer normally would ask for the license of the driver at an accident scene. He related at trial as follows:

Q. Would it further [pique] your curiosity at this accident scene, where you already know it is a one-car accident, the driver of the vehicle is wearing a bathrobe and tennis shoes, would it further [pique] your curiosity if an independent witness came to you in person at the scene saying, I have spent time with her prior to you getting here, I called 911, she is disoriented, and confused, something is not right?

* * *

THE WITNESS: Yes, sir.

Q. . . . [T]he three things together are probable cause to get her out of the vehicle; is that your understanding?

-6-

A. Possibly.

Q. Any excuse by a police officer not to get that person out of the vehicle and see what is going on with their sobriety, if you have those three pieces of information?

A. Yeah, the third one is a tough one to go around, you know, I wasn't aware of that, but if that's the case, yeah, you should get them out and talk to them.

Deputy A. J. Yoakley of LCSD testified that an officer "begins investigating the accident by asking for driver's license, registration, proof of insurance of the driver . . . ." In regard to statements by an independent witness that a driver was disoriented and confused, he noted he "would ask questions prior to her doing any field sobriety test just to see for myself whether or not she was confused or not."

The toxicology report from the Tennessee Bureau of Investigation indicated that Decedent's blood sample showed greater than 1.0 ug/mi of Zolpidem (Ambien) and 0.11 micrograms per milliliter of Alprazolam (Xanax), a benzodiazepine. Based on these levels of drugs alone, Darinka Mileusnic-Polchan, M.D., Ph.D., the physician who performed the autopsy, opined that drugs were a contributing factor in Decedent's death. In her deposition, Dr. Mileusnic-Polchan stated the amount of drugs in Decedent's system was ten times more than what is considered therapeutic. She further testified that at these levels Decedent was "affected, her motor functions, her reaction time, she's definitely going to be somnolent, no question about it, and certainly not able to drive, as was shown here." She noted that a person's functioning on such a high dose would depend on how long the person had been taking the drugs and whether a tolerance had built up for them. Dr. Mileusnic-Polchan could not determine at what point Decedent ingested the drugs. She exhibited surprise that Decedent was "not more disabled than just disoriented, but again, it would depend on the tolerance level."

Glen E. Farr, Pharm. D., a professor of clinical pharmacy at the University of Tennessee College of Pharmacy, testified by deposition as a pharmacology expert. He analyzed the toxicology results of the autopsy report as to the levels of Xanax and Ambien. Dr. Farr observed that Alprazolam is generic for Xanax and is used to treat anxiety. The drug has a depressant effect on the central nervous system. Although Dr. Farr found the amount of Xanax to be at a high level, he noted it was still within range of a therapeutic dose. He related that Zolpidem (Ambien) would put one to sleep instead of calming one down. He opined that the amount of this drug in Decedent's system exceeded the therapeutic range and was at a toxic level. He further observed the use of the two drugs together greatly impacted their effect. Dr. Farr testified that the expected behavior of someone with this much Ambien

in her system would be drowsiness, slurred speech, disorientation, confusion, and unsteady gait up to being comatose. He noted adrenaline released as a result of a car wreck would not reverse any of these affects, but one would be a little more alert for a few minutes. He opined that at the levels tested "it would be very difficult to function." He doubted Decedent's ability to walk at all, much less pass a field sobriety test.

Dr. Farr noted that the general prescription for Ambien is one tablet right before going to bed and patients are directed not to drive after taking the dose. In his opinion, Decedent had ingested between four and twenty Ambien pills to reach the blood level that she had in her system at the time of her death. He did not know exactly how many Ambien pills Decedent took but was confident in saying that she had ingested at least nine pills, or rather 90 milligrams.

When Dr. Farr was asked whether he could tell if Decedent had taken any Ambien prior to the first accident, he responded that she "would have had to have unless at the time of the first accident she took a whopping big dose and it was absorbed – I mean, yeah, she would have had to of taken it prior to the first accident." That response was followed by this exchange:

Q. Okay. So you, you can say, within a reasonable degree of professional certainty, she took the Ambien before the first accident?

A. Within a reasonable degree of certainty, I can't say for certain. I mean, it's possible that she could of had the wreck, swallowed a bunch of pills and 15 minutes later she –

Q. Okay.

A. – had a level, but, I mean that would . . . .

Q. Could she have taken the Xanax after the first wreck?

A. Possibly. But 15 to 20 minutes, I mean, she would of had to have some already in her system and then added. I'm thinking just the physical act of taking a pill, yeah. Based on the blood levels and absorption patterns of those, it would be very difficult to reach that level within 15 minutes.

Q. Did she – can you testify, within a reasonable degree of professional certainty, that she didn't take Xanax after the first wreck?

A.   Yeah, again, 51 percent that she would not have taken it after the first wreck.

Dr. Farr further observed that Ambien could cause bizarre behavior, sleep walking, and a significant degree of amnesia, such that a person could take actions such as driving a car and have no conscious memory of the action later.  He related that he would not be surprised that Decedent could communicate, but the accuracy of her communications might be in question. He described a phenomenon called "twilight sleep" where a person can take one pill and get an amnestic effect, but does not remember taking the pill, and sort of wakes up and takes another, and so on, resulting in an overdose.

The trial court entered a memorandum opinion on January 17, 2013, finding that the Plaintiffs had not proven their case and that judgment would be entered for Loudon County. A final judgment was thereafter entered by the trial court on January 30, 2013, which incorporated the court's memorandum opinion.  The trial court held in relevant part as follows:

> The Court finds from the evidence set out above that there were no words or actions between Deputy Blakney and Deceased that established that Deputy Blakney ever "affirmatively undertook to protect" Deceased or that Deceased ever relied upon such an understanding.  It is clear from the proof that Deceased refused aid or protection from not only Deputy Blakney but from all other persons at the scene that offered to help.  Based on this reasoning the Court finds that the public duty doctrine applies to this case and the special duty exception does not apply, so the public duty doctrine is a complete bar to the Plaintiff[s'] lawsuit.

The trial court further observed that

> [b]ased on the evidence of the witnesses as to Deceased's condition at the first wreck scene, the ability of Deceased to follow instructions and drive on the highway, and the expert opinions above, the Court finds that it is more probable than not that immediately after the first wreck she was in an anxious state and took a "who[p]ping amount" of Ambien which was being absorbed in her system during the thirty-five (35) to forty (40) minutes she sat at the first wreck scene and by the time she reached the second wreck scene the Ambien was absorbed into her body at the levels noted on the toxicology report.

As to the issue of comparative fault, the court held:

No proof was entered that anyone other than Deceased had possession or control over her medication or that anyone had control over Deceased in a manner they could force or coerce her into taking the amount of medication she took. The Court finds from the evidence that the Deceased voluntarily and intentionally took her prescribed medication which produced the levels found in her blood.

The Court finds from the evidence that Deceased was negligent by voluntarily and intentionally ingesting the drugs she did, by not informing the Deputy or wrecker driver she had ingested drugs; by refusing aid to help her and then by driving a vehicle on the roadways in her condition.

The Court further finds that Defendant's negligence directly contributed to her death and without which her death would not have occurred. The Court further finds her negligence was a substantial factor in bringing about her death which could have been reasonably foreseen or anticipated by a person of ordinary intelligence and prudence. Base[d] on these findings the Court finds Deceased to be at fault.

Assuming fault on the part of Deputy Blakney, the Court must compare the fault of those parties. The Court finds that the fault of Deceased is at least fifty percent (50%) or more, and Plaintiff is therefore not entitled to recover any damages.

As to causation, the trial court related:

. . . [T]he Court does find that the drugs in Deceased['s] blood, at the time of the accident, w[ere] one of the factors causing the accident. However, due to the lack of evidence as to how the accident occurred, it would be speculation to say this was the sole cause of the accident.

A timely notice of appeal was filed by the Plaintiffs.

## II. ISSUES

The issues raised by the Plaintiffs are restated as follows:

1. Did the trial court err when it did not consider whether a duty of reasonable care was owed to the Decedent.

2.  Is the trial court's ruling that the special duty exception to the public duty doctrine is not applicable to this case in error.

3.  Should the trial court have applied Section 324 of the Restatement (Second) of Torts to the facts of this case, and did it commit error by not doing so.

4.  Was it error for the trial court to determine that in order to prove causation, the complained of conduct had to be the sole cause of the injury.

5.  Did the trial court abuse its discretion by sustaining an objection to speculation when a witness was asked to testify about her own intentions or plans.

6.  Was the trial court's assignment of at least 50 percent of the fault to the Decedent in error.


## III.  STANDARD OF REVIEW

A trial court's factual findings after a bench trial are reviewed de novo, with a presumption of correctness unless the evidence preponderates against the court's findings. Tenn. R. App. P. 13(d).  The court's legal conclusions are to be reviewed de novo without a presumption of correctness.  Tenn. R. App. P. 13(d).  Whether a duty of care is owed is a question of law to be determined by the court.  *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).


## IV.  DISCUSSION

The Plaintiffs contend that Deputy Blakney undertook to protect Decedent when he told Ms. Thomas he probably would not allow Decedent to drive away.  They assert Decedent's reliance on Deputy Blakney is demonstrated by her earlier request of Ms. Thomas to summon assistance.  They further contend Ms. Thomas relied on Deputy Blakney's care of Decedent as the deciding factor in discontinuing her own aid of Decedent.  The Plaintiffs argue Decedent was incapacitated due to ingestion of the medications and that Deputy Blakney knew or should have known that Decedent was impaired, that she was a danger to herself and others while driving in that condition, and that Deputy Blakney should have observed and detained her, but instead he allowed her to drive away.  Accordingly, they assert Deputy Blakney had affirmatively undertaken to protect Decedent and she relied upon him, but he left her in a worse position than he found her.

-11-

# GTLA

In a negligence action against a local governmental entity, the threshold question is whether the governmental entity's immunity has been waived under GTLA. *Brown v. Hamilton Cnty.*, 126 S.W.3d 43, 46 (Tenn. Ct. App. 2003). GTLA provides that, "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201. GTLA specifically provides that before holding a governmental entity liable for damages, the court must "first determine that the employee's or employees' act or acts were negligent and the proximate cause of plaintiff's injury, that the employee or employees acted within the scope of their employment and that none of the exceptions listed in § 29-20-205 are applicable to the facts before the court." Tenn. Code Ann. § 29-20-310(a). Any claim for damages must be brought in "strict compliance" with the terms of GTLA. Tenn. Code Ann. § 29-20-201(c).

In its first determination in this matter, the trial court found that none of the listed exceptions applied and ruled the claim was barred by the public duty doctrine. The public duty doctrine, a creature of common law, comes into play if the entity is not otherwise protected by statutory immunity. *Chase v. City of Memphis*, 971 S.W.2d 380, 385 (Tenn. 1998). After the first appeal, we stated as follows:

> The public duty doctrine shields a public employee from lawsuits alleging liability for a breach of that employee's duty owed to the public at large. *Ezell v. Cockrell*, 902 S.W.2d 394[, 397] (Tenn. 1995). The doctrine states that private citizens cannot maintain a lawsuit complaining of a breach of duty by a public employee unless the private citizen can show a special relationship/interest/injury, not common to the general public. *Id.*
>
> In *Ezell*, the Supreme Court held that the public duty doctrine remained viable despite enactment of the GTLA, but that there was an "exception to the rule of no-liability that applies where a 'special relationship' exists between the plaintiff and the public employee, which gives rise to a 'special duty' that is more particular than the duty owed by the employee to the public at large." *Id.* at 401. The Supreme Court said that in Tennessee, the "special duty" exception existed when 1) officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking; 2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or 3) the

plaintiff alleges a cause of action involving intent, malice, or reckless misconduct. *Id.* at 402.

In this case, the Trial Court found that the public duty doctrine applied, and that even if Blakney did undertake to protect [Decedent], [Decedent] did not rely upon his undertaking, and thus the special duty exception did not apply based on subpart one of the above analysis. . . .

In our previous ruling, we observed that the trial court did not consider whether Deputy Blakney might have owed a duty to Decedent that was different than the duty he owed to the public at large as a police officer. We related as follows:

Section 324 of the Restatement (2nd) of Torts states:

One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

In this case, if Blakney's duty as a police officer was only to the public at large, as defendants argue,[5] then he owed no specific duty to [Decedent], unless he affirmatively undertook to assume such duty. Pursuant to the above Restatement (2nd) of Torts 324, if Blakney took charge of [Decedent] and [Decedent] was helpless, and Blakney's discontinuation of his aid/protection left [Decedent] in a worse position than she was in before, then liability could attach, as Blakney would have undertaken to assume the duty of aiding [Decedent].

\* \* \*

In this case, there is a dispute of fact regarding whether [Decedent] was "helpless" and whether Blakney "took charge of" her such that summary

---

[5]It is "generally held that the specific duty to preserve the peace is one which the officer owes to the public generally, and not to particular individuals, and that the breach of such duty accordingly creates no liability on the part of the officer to an individual who was damaged by the lawbreaker's conduct. Rather, it is held, a law enforcement officer is amenable only to the public, and punishable only by indictment for the breach of his duty as conservator of the peace." *Hurd v. Flores*, 221 S.W.3d 14 (Tenn. Ct. App. 2006).

judgment was inappropriate. . . .

In this case there is also a question of whether a special duty exception exists. The Trial Court found there was a dispute of fact about whether Blakney affirmatively undertook to help [Decedent], but that [Decedent] clearly did not rely upon that undertaking. . . .

As in other negligence actions, a plaintiff must establish the existence of a duty or standard of care in an action for negligence of a governmental employee. *Ezell*, 902 S.W.2d at 397, 400. The determinative question before us is whether the special duty exception applies. "Where the special duty exception is found to apply, it operates to negate the public duty doctrine defense." *Wells v. Hamblen Cnty.*, No. E2004-01968-COA-R3-CV, 2005 WL 2007197, at *4 (Tenn. Ct. App. Aug. 22, 2005), *perm. app. denied* (Tenn. Dec. 19, 2005) (citing *Mathews v. Pickett Cnty.*, 996 S.W.2d 162, 165 (Tenn. 1999)). If it does not, the public duty doctrine prevents imposition of liability.

The proof in the record does not demonstrate that Deputy Blakney affirmatively undertook to protect Decedent. Deputy Blakney responded to a single vehicle accident involving only minor, if any, property damage. He checked Decedent's injury status and offered to call an ambulance for her on multiple occasions. Decedent refused any assistance and did not appear "helpless." She was able to communicate with Deputy Blakney. He found her to be slightly shaken up but demonstrating no slurred speech, nor dilated pupils, no smell of alcohol, and no bloodshot eyes. According to Deputy Blakney, in his professional opinion, he had no cause to arrest, detain, or seize Decedent. The evidence does not support a determination that Decedent relied on anyone and she never allowed Deputy Blakney to "take charge" of her. Nothing in the proof supports the claim by the Plaintiffs that Deputy Blakney acted to protect Decedent or undertook the duty of aiding her. The trial court properly determined that the public duty doctrine applied in this case and the special duty exception did not apply, resulting in the public duty doctrine being a complete bar to Plaintiffs' lawsuit.

This matter brings to mind the *Wells* case, where the plaintiff's claim was based on a deputy's failure to act. We specifically noted in *Wells* as follows:

These allegations, taken as true, do not establish the special duty exception described in *Ezell* simply because they describe solely what the deputy **told** Ms. Wells. The relevant special duty exception expressly requires that the officers undertake to protect . . . "by their actions." It is not alleged that Deputy Snow took any **action** to affirmatively undertake to protect Matthew

-14-

Wells. . . . [O]ur Supreme Court specifically chose not to adopt a standard that include[d] promises, assurances, or any other verbal communication. We cannot ignore that Court's intentional inclusion of a requirement that the governmental employee or law enforcement officer take some action.

In this case, while he told Ms. Wells not to worry, Deputy Snow simply gave Ms. Wells his view or opinion of the situation and explained how he planned to handle it in order to take care of Matthew. He was mistaken, and the consequences were tragic. However, if we were to find that Deputy Snow's words created a special duty that overcame the public duty doctrine, little would remain of that doctrine. Almost any reassuring communication by a police officer to a potential victim or the victim's family would remove the protection. **The formulation adopted by our Supreme Court does not rest on promises or verbal assurances, and words alone will not create an exception to the public duty doctrine**.

*Wells*, 2005 WL 2007197, at *7-8 (emphasis added). In this action currently before us, we likewise must find that any assurances by Deputy Blakney to Ms. Thomas did not result in him affirmatively undertaking to protect Decedent. The special duty exception is not applicable. The public duty doctrine precludes liability.

In view of the fact that our determination dispositively resolves this appeal, we find all other issues raised by the Plaintiffs are moot and pretermit consideration of them.

## V. CONCLUSION

The judgment of the trial court is affirmed. The costs associated with this appeal are assessed to the appellants, Barbara A. Lynch, deceased, by her sister and next of kin, Celine Hayes. The case is remanded for collection of costs assessed below, pursuant to applicable law.

_____
JOHN W. McCLARTY, JUDGE

-15-