IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 16, 2020 Session

## CRYSTAL SPEARMAN, Individually and as Parent and Next Fried of KENJI LEWIS, a Minor v. SHELBY COUNTY BOARD OF EDUCATION and SHELBY COUNTY SCHOOLS

**Appeal from the Circuit Court for Shelby County**
**No. CT-003144-16   Yolanda R. Kight, Judge**

_____

### No. W2019-02050-COA-R3-CV

_____

This suit involves an injury sustained by a minor at a track and field tryout at the middle school he attended.  The minor's mother brought suit individually and on behalf of her minor child against the county school system and the school board for the minor's injuries and subsequent medical expenses.  After a bench trial, the trial court found in favor of the plaintiff and awarded her $200,000 in compensatory damages.  The defendants appealed. We affirm the trial court's decisions and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Andre B. Mathis, Memphis, Tennessee, for the appellants, Shelby County Board of Education and Shelby County Schools.

Derek Fairchilds, Memphis, Tennessee, for the appellee, Crystal Spearman, individually, and as the parent and next friend of Kenji Lewis, a minor.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

This suit involves a claim for personal injuries sustained by a minor, Kenji Lewis ("Kenji"), and brought by his mother, Crystal Spearman ("Plaintiff"), under the Tennessee

Governmental Tort Liability Act ("the GTLA"). In August 2016, Plaintiff filed a claim for negligence under the GTLA against the Shelby County Board of Education and Shelby County Schools (collectively "Defendants"). In her complaint, Plaintiff sought to recover for Kenji's injuries, his pain and suffering, his loss of enjoyment of life, his mental anguish, and for medical bills incurred as a result of the incident.

The events that gave rise to the suit occurred on January 27, 2016, at Geeter Middle School in Memphis, Tennessee.[1] At that time, Kenji was twelve years old and a sixth-grade student at Geeter Middle School. On the day of the incident, track and field tryouts were held in a field behind the school. Marcus Mosby, who at the time was a teacher assistant and track and field coach at the school, was in charge of the tryouts. Approximately 30 to 40 students attended the tryouts, including Kenji. One event that was being held as part of the tryouts was the shot put. The shot put event involves a person holding a heavy metal ball under his or her chin, spinning, and throwing the ball as far as he or she can. Kenji had played a variety of sports, including football, since he was five or six years old. However, prior to the tryouts he had not participated in shot put and was not familiar with the event. Although Mr. Mosby competed in track and field when he was in high school, he did not compete in the shot put event.

During the tryouts, Mr. Mosby stood approximately 25 feet away from the students. While Mr. Mosby observed, the students took turns throwing a shot put in his direction. Two students stood near Mr. Mosby to help retrieve the thrown balls. The shot put being used during the tryouts was made of metal, approximately the size of an orange, and weighed between eight and ten pounds. Mr. Mosby testified that before a student would throw a shot put, he would make sure the other students were behind the person throwing. At some point during the tryouts, Mr. Mosby stopped the students to demonstrate how to properly throw the shot put. While Mr. Mosby was still standing across from the group of students, he verbally instructed and motioned with his hands for the students to move back. Mr. Mosby testified that prior to throwing the shot put, he also turned and took a few steps in the other direction. Mr. Mosby testified that the group of students was beginning to move back when he turned to demonstrate.

With his back facing the group of students, Mr. Mosby turned and threw the shot put back toward the group of students, now standing approximately 30 to 40 feet away. Mr. Mosby stated that he intended to have the shot put fall short of the students. However, Kenji did not move farther away and stood approximately five feet closer to Mr. Mosby than the other students. Upon Mr. Mosby releasing the shot put, he immediately realized it was going to strike Kenji. He yelled for Kenji to move, but before Kenji could move, the shot put struck Kenji in the side of his head, causing him to fall to the ground. Kenji testified that he did not see his classmates move backward and did not hear Mr. Mosby

---

[1] Geeter Middle School is part of Shelby County Schools, which is controlled and managed by the Shelby County Board of Education.

instruct them to move back. Prior to being struck by the shot put, Kenji was facing sideways in relation to Mr. Mosby and did not see him throw it towards him.

After the shot put hit Kenji in the side of his head, Mr. Mosby rushed to Kenji. Mr. Mosby stated that he saw blood coming from Kenji's mouth and could feel an indentation on the side of Kenji's head. At trial, Kenji stated that after being struck by the shot put, he did not know what happened, he was unable to get up from the ground, and he could not move the right side of his body. Emergency personnel were called to the scene, and Kenji was taken by ambulance to LeBonheur Children's Hospital in Memphis. On the way to the hospital, the emergency personnel recorded that Kenji reported pain of 10 on a scale of 1 to 10.

In total, Kenji spent three days at LeBonheur Children's Hospital. Kenji's parents testified that when he was initially admitted, he had difficulty maintaining consciousness and speaking. However, the hospital records indicate that Kenji was alert and oriented. At the hospital, Kenji reported numbness along the right side of his body and was experiencing pain between 8 and 10 on a scale of 1 to 10. He also stated that he was scared he was going to die and would not be able to play sports again due to the injury. Dr. Paul Klimo, a pediatric neurosurgeon, examined Kenji at the hospital. Dr. Klimo determined that Kenji suffered a cosmetic (meaning easily visible) skull defect in the form of a depressed skull fracture,[2] caused by the shot put striking him. Kenji received prescription medications at the hospital to manage his pain.

Kenji underwent a CT scan shortly after being admitted to the hospital. The initial CT scan revealed that Kenji suffered a depressed skull fracture to the left side of his skull, measuring 4.5 by 4.5 centimeters. The scan showed that Kenji's skull was depressed by 7.5 millimeters. While later scans showed signs of brain damage, the initial scan on January 27, 2016, did not show evidence of brain damage or swelling to the brain. After receiving the results of the CT scan, Kenji was scheduled for surgery to repair his injury the next morning.

Kenji spent the night before his surgery at the hospital. Throughout his first night in the hospital, Kenji reported to be in severe pain and was administered several types of pain medications, including morphine and oxycodone. Kenji and Plaintiff both testified that he barely slept and spent a significant portion of the night crying and screaming. Throughout the night, Kenji expressed his worry about the potential of not being able to play sports again. At trial, Plaintiff testified that Kenji was angry, upset, and made comments about wanting to die or wanting to pull the medical equipment out of his arms.

---

[2] Dr. Merrill Wise, Plaintiff's medical expert, testified that a "depressed skull fracture" is a break in the continuity of a person's skull that results in the skull's contour being depressed from its normal position. In this case, Dr. Wise determined that Kenji's depressed skull fracture was the result of blunt force trauma.

The next morning, January 28, 2016, Dr. Klimo performed surgery on Kenji to repair his depressed skull. Prior to surgery, Kenji commented that he continued to experience immense pain, that there was still numbness and "tingling" on the right side of his body, and that he was nervous about the surgery. The surgery performed by Dr. Klimo was described as a left parasagittal parietal craniotomy. It involved Dr. Klimo removing the depressed portion of Kenji's skull, reducing the depression, and reattaching the repaired portion of the skull. Titanium plates and screws, known as a Biomet plating system, were used to reattach the repaired portion of skull. Dr. Klimo testified that the plating system is permanent and will remain unless an issue arises that requires it to be surgically removed. When Dr. Klimo first removed the damaged portion of Kenji's skull, he discovered a notable hematoma (a collection of blood under the scalp) at the impact site of Kenji's head. The surgery was successful, and Kenji remained in the hospital for monitoring until the next day.

The remainder of the time Kenji spent in LeBonheur Children's Hospital was similar to the initial portion of his stay. Kenji's pain continued, although he testified that it was less severe after surgery. He had trouble eating and needed assistance from Plaintiff to walk. Throughout the second night, Kenji remained restless, he would cry out after having nightmares of the incident, and he remained in varying levels of pain. On January 29, the day Kenji was discharged, he was reported to be in better spirits with his pain being managed. Throughout his three days at the hospital, Kenji received a consistent and varied dose of pain medications, including fentanyl, morphine, Percocet, oxycodone, and Tylenol. To manage his pain at home, Kenji was prescribed Percocet, oxycodone, and ibuprofen. Upon being discharged, Plaintiff stated that Kenji's primary concern was the appearance of the scar on the side of his head. Still, Kenji continued to report pain and numbness on the right side of his body.

Kenji spent the next several weeks at home, without going to school, playing sports, or playing with his friends. Before returning to school, Kenji remained at home for approximately two to three weeks. During that time, he was able to keep up with his schoolwork and maintain good grades. However, his nightmares and ailments continued. Kenji and Plaintiff testified that Kenji would occasionally wake up screaming in the middle of the night with images of the incident replaying in his head. They stated that these incidents occurred frequently when Kenji first returned home and that, up until trial, they have continued to a lesser degree. While Kenji's pain was being managed at home, he testified that he began experiencing headaches, which did not occur prior to his injury. At trial, he testified that he still experiences headaches to varying degrees of frequency.

Following his release from the hospital, Kenji had several follow-up appointments with Dr. Klimo. Approximately one month after the incident, Dr. Klimo released Kenji for participation in track and field. However, Kenji never returned to track and field out of fear from the incident. At this time, Kenji had returned to school, he reported no major

- 4 -

problems, and his surgical incision was healing well. In April 2016, approximately three months after being injured, Plaintiff reported that Kenji was experiencing headaches and dizziness. At this appointment, Kenji underwent another CT scan that showed a small amount of hypodensity on Kenji's brain surrounding the site of impact from the shot put. Dr. Klimo and Dr. Wise testified that hypodensity on a brain is bruising or scarring that indicates a permanent injury or brain damage. Dr. Wise further explained that the evidence of hypodensity likely did not show up on the CT scan from the day of the incident because bruising of the brain may take weeks or months to develop. Despite the CT scan that indicated Kenji suffered a small amount of brain damage, Dr. Klimo released Kenji for full participation in sports, including football.[3] At subsequent follow-up appointments, Plaintiff continued to report that Kenji was experiencing pain on the left side of his head, dizziness, and headaches. Aside from these complaints, Kenji had no problems with weakness, loss of sensation, balance, coordination, or reflexes, and his fracture site was well-healed. At an appointment in February 2017, a CT scan again showed a small amount of bruising or scarring on the left side of Kenji's brain.[4] Dr. Klimo testified that based on the results of the CT scan, bruising or scarring on the brain appeared to be the result of Kenji's injury.

In preparation for this case, on November 10, 2017, Dr. Wise performed an independent medical evaluation of Kenji. Dr. Wise testified that during the evaluation, Kenji stated that he maintained his high grades, primarily receiving As and Bs, and is an active participant in football and basketball. Kenji did not report problems with his vision, hearing, balance, appetite, or sleep. He denied having suffered a seizure or having problems focusing. While Kenji reported that he suffered weekly headaches, he also stated that over-the-counter medicine helped manage the headaches and that he had not missed any of his normal activities.

After evaluating Kenji and reviewing his medical records, Dr. Wise developed several opinions on Kenji's injuries. He concluded that Kenji suffered blunt force trauma to his head, causing a depressed skull fracture that resulted in permanent brain damage or scarring. Based on his review of the records, he found that the injury was caused by Kenji being struck by the shot put. Dr. Wise also concluded that Kenji's recurrent headaches are due to the head trauma and that Kenji is at an elevated risk of developing posttraumatic seizures and psychiatric problems. However, he also stated that he believed the headaches to be mild and not a hindrance to Kenji's normal functions, including participation in sports. Furthermore, Dr. Wise found the medical services rendered to Kenji were necessary for the evaluation and treatment of his injury. In total, Plaintiff incurred $63,858.69 in medical bills. These bills include the emergency services on the day of the incident, the

---

[3] Although Dr. Klimo released Kenji to play football after the April 25 visit, Plaintiff testified that Kenji only took part in minor, non-physical drills.

[4] The report generated from a scan in February 2017 stated that the scan showed encephalomalacia on the left side of Kenji's brain. Dr. Wise explained that in the context of this case, hypodensity and encephalomalacia are synonymous.

care Kenji received at LeBonheur Children's Hospital, and the follow-up appointments with Dr. Klimo. In Dr. Wise's opinion, the bills were reasonable and consistent with the customary charges in the Memphis area. He testified that the bills reflect the cost of care in response to Kenji's injury.

Amidst the medical care and evaluations that Kenji received, on August 3, 2016, Plaintiff filed her complaint in this case. Plaintiff filed her claims against Defendants under the GTLA, claiming that Defendants are vicariously liable for the negligence of Mr. Mosby. Plaintiff sought actual and compensatory damages for the injuries and expenses sustained by her and Kenji. Defendants jointly answered on September 12, 2016. Several years of litigation and discovery followed before the case was set for trial.

Prior to trial, the parties submitted several filings to the trial court. On January 4, 2019, Plaintiff filed a motion to exclude evidence rebutting the presumption under Tennessee Code Annotated section 24-5-113(b)(1) that the medical expenses are reasonable. The trial court granted this motion. On January 8, 2019, Defendants moved to exclude Dr. Wise as an expert or, alternatively, to limit his testimony. In doing so, Defendants claimed that Dr. Wise was unqualified to speak on the medical issues in this case and that his opinions are speculative and unreliable. On the day of trial, the trial court orally denied this motion and allowed Dr. Wise to testify. On January 11, 2019, Defendants filed an objection to Plaintiff's designation of Dr. Klimo's deposition as evidence for trial. At trial, Defendants objected again to the use of Dr. Klimo's deposition. Ultimately, Dr. Klimo was absent from trial, and the trial court allowed Plaintiff to read Dr. Klimo's deposition into evidence.

A three-day bench trial took place on January 22, January 23, and February 28, 2019.[5] Over these three days, several witnesses testified in-person, including Mr. Mosby, Kenji, Dr. Wise, and Plaintiff. Additionally, portions of Dr. Klimo's deposition were read into evidence by the paralegal for Plaintiff's counsel.

Mr. Mosby testified on how the incident occurred and events that transpired after the incident. Shortly after the incident on January 27, 2016, the Shelby County Board of Education performed an investigation. Representatives for the Board informed Mr. Mosby that the investigation revealed that Mr. Mosby failed to use proper protocol when he demonstrated how to throw the shot put. Based on the investigation, the representatives, including the Superintendent, concluded that Mr. Mosby neglected his duty as a school employee. At the end of the 2015-2016 school year, Mr. Mosby resigned from his employment at Geeter Middle School.

Mr. Mosby also testified that he accepted full responsibility for Kenji's injuries. He

---

[5] The final order of judgment states that trial only took place on January 22 and January 23, 2019. However, it is clear that additional proceedings took place on February 28, 2019.

did not fault Kenji for not moving out of the way or not listening to his directions. Instead, Mr. Mosby agreed that the safest way to throw a shot put was to throw it away from other people, ensuring others are behind the person throwing. He also stated that he did not receive proper training on the safety protocols for the shot put event prior to the incident. While Mr. Mosby took responsibility for injuring Kenji with the shot put, he stressed that it was an accident and that he did not intend to strike Kenji.

Along with the headaches and nightmares, Kenji testified regarding other ways the incident has affected him. He stated that it took several months before he was "back" to his normal routine. While Dr. Klimo cleared him to play football in April 2016, Kenji testified the he began playing again in August 2016. He stated that he now plays football and basketball "like everybody else," with no restrictions. Despite his return to sports, though, Kenji still worries about the scar on his head from the surgery. He testified that the scar is still tender to the touch and that other students at his school have made comments about him "hav[ing] a dent in [his] head."

In addition to many of the facts previously discussed, Plaintiff testified on Kenji's adjustment after the incident. She verified that Kenji has continued playing football, a sport in which he excels, but he did not return to track and field. Plaintiff also testified that Kenji is self-conscious about his scar and residual deformity on his head because of how it may appear later in life. She stated that Kenji's father, his grandfather, and his uncles all have gone bald. She claimed that this family history worries Kenji, making him think he will lose his hair, which will cause his scar and skull depression to show. Despite Kenji's fear that his scar will show in the future, Plaintiff, Kenji, and Dr. Klimo (at previous appointments) stated that, currently, Kenji's hair covers the scar, making it difficult to see.

At the close of Plaintiff's proof, Defendants moved for an involuntary dismissal under Tennessee Rule of Civil Procedure 41.02(2). In doing so, Defendants claimed that Plaintiff failed to show Mr. Mosby acted negligently. Instead, they asserted that Mr. Mosby's actions were intentional, reckless, or grossly negligent. As a result, they claimed that they were immune from liability under the GTLA. The trial court disagreed and denied the motion. After the trial court denied the motion for involuntary dismissal, Defendants rested without putting on proof.

On October 15, 2019, the trial court rendered an oral ruling in favor of Plaintiff. Two weeks later, it entered a final written order, incorporating the transcript of its oral ruling by reference. In particular, the court found (1) that Mr. Mosby was acting within the scope of his employment at Geeter Middle School at the time of the incident; (2) that Mr. Mosby acted negligently in injuring Kenji; (3) that Mr. Mosby's actions were the actual and proximate cause of Kenji's injuries and damages; and (4) that Defendants are vicariously liable for Mr. Mosby's negligent acts and are not immune under the GTLA. The court further found that no fault should be assessed to Kenji and that Defendants, through Mr. Mosby, were solely liable. The court awarded Plaintiff $200,000 in

compensatory damages for Kenji's injuries and medical expenses.

Defendants timely appealed.[6]

## II.   ISSUES PRESENTED

Defendants raise six issues on appeal, which we have reworded and rearranged:

1. Whether the trial court erred in denying Defendants' motion for involuntary dismissal;

2. Whether the trial court erred in entering a judgment in favor of Plaintiff;[7]

3. Whether the trial court erred in admitting the deposition testimony of Dr. Paul Klimo;

4. Whether the trial court erred in denying Defendants' motion to exclude Dr. Merrill Wise's expert testimony;

5. Whether the trial court erred in admitting Kenji's medical bills; and

6. Whether the trial court erred in finding that Defendants did not rebut the presumption that Kenji had no capacity for negligence.

In addition to the issues raised by Defendants, Plaintiff raises one issue:

1. Whether the trial court erred in only awarding Plaintiff $200,000 in compensatory damages.

For the reasons stated herein, the decisions of the trial court are affirmed and this case is remanded.

## III.   STANDARD OF REVIEW

In civil actions where the trial court determines the facts, factual findings are

---

[6] After Defendants filed the notice of appeal, the trial court entered a consent order awarding Plaintiff $12,077.30 in discretionary costs under Tennessee Rule of Civil Procedure 54.04(2).

[7] While Defendants list this as an issue, we find no substantive discussion on the issue in their principal brief. Therefore, this issue is waived on appeal. *See Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010) (stating "[i]t is not the role of the courts . . . to research or construct a litigant's case or arguments, . . . and where a party fails to develop an argument in support of [its] contention . . ., the issue is waived"); *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (stating "an issue is waived where it is simply raised without any argument regarding its merits").

reviewed *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). Questions of law are reviewed *de novo* with no presumption of correctness. *In re Sidney J.*, 313 S.W.3d 772, 774 (Tenn. 2010).

Review of a trial court's ruling on a motion for involuntary dismissal under Tennessee Rule of Civil Procedure 41.02(2) is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007). When reviewing a decision on a motion for involuntary dismissal, the trial court's factual findings are reviewed *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006). The court's legal conclusions are reviewed *de novo* with no presumption of correctness. *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017). "The court may dismiss the plaintiff's claim if the plaintiff has failed to make out a prima facie case." *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 414 (Tenn. 2013) (citing *Bldg. Materials Corp.*, 211 S.W.3d at 711). Similarly, dismissal is appropriate under Rule 41.02(2) when "the plaintiff fail[s] to demonstrate a right to the relief sought." *Id.* at 413 (citing *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 740 (Tenn. 1997)).

"Generally, the admissibility of evidence is within the sound discretion of the trial court." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 294 (Tenn. 2017) (citing *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004)). "[A] trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Id.* Similarly, "questions regarding the admissibility, relevancy, and competency of expert testimony are left to the discretion of the trial court, and the trial court's ruling may only be overturned if that discretion is abused or arbitrarily exercised." *Mabry v. Bd. of Prof'l Responsibility of Supreme Court*, 458 S.W.3d 900, 909 (Tenn. 2014) (citation omitted). A trial court abuses its discretion "when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (alterations in original) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

In a bench trial, a trial court's calculation of damages is reviewed as a question of fact. *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 789 (Tenn. Ct. App. 2010) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102, 115 (Tenn. 2016)); *Moody v. Lea*, 83 S.W.3d 745, 751 (Tenn. Ct. App. 2001). Therefore, "[t]his Court will modify a trial court's award of damages . . . only if the evidence preponderates against the amount of damages awarded." *Poole*, 337 S.W.3d at 789; *see also Moody*, 83 S.W.3d at 751 (citing *Beaty*, 15 S.W.3d at 829). In contrast, a trial court's measure of damages is a question of law that is reviewed *de novo*, without a presumption of correctness. *Poole*, 337 S.W.3d at 789 (citing *Beaty*, 15 S.W.3d at 829).

## IV.    DISCUSSION

### A. Involuntary Dismissal

In their Rule 41.02 motion for involuntary dismissal, Defendants claimed that they were immune from suit under the GTLA because Mr. Mosby's actions were intentional, reckless, or grossly negligent.  On appeal, Defendants assert the same reasons for why their motion should have been granted.

In Tennessee, "the doctrine of sovereign immunity is firmly embedded in our jurisprudence." *City of Lavergne v. S. Silver, Inc.*, 872 S.W.2d 687, 689 (Tenn. Ct. App. 1993); *see also Sallee v. Barrett*, 171 S.W.3d 822, 826 (Tenn. 2005).  "[O]ur state constitution has empowered our legislature to waive the protections of sovereign immunity: 'Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct.'" *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 360 (Tenn. 2011) (quoting Tenn. Const. art. I, § 17).  Stated differently, in order to remove immunity from the state, the Legislature "must specifically consent to suit." *Id.*

The GTLA, enacted in 1973, "is premised explicitly on the absolute immunity of governmental entities." *City of Lavergne*, 872 S.W.2d at 690.  Under the GTLA, unless otherwise stated, "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201; *see also Hughes*, 340 S.W.3d at 360. "When immunity is removed [under the GTLA,] any claim for damages must be brought in strict compliance with the terms of [the GTLA]."  Tenn. Code Ann. § 29-20-201(c). While there are several exceptions to the general rule of governmental immunity, *see* Tenn. Code Ann. §§ 29-20-202 to -205, only one is particularly relevant to this appeal.  Under the GTLA, governmental immunity "is removed for injur[ies] proximately caused by a *negligent* act or omission of any employee [acting] within the scope of his employment." *Id.* 29-20-205 (emphasis added); *see also Hughes*, 340 S.W.3d at 368.  In contrast, the intentional torts of assault and battery that are committed by an employee acting within the scope of his employment do not remove governmental immunity. *See Hughes*, 340 S.W.3d at 368-69.

As our Supreme Court has previously stated:

Because an assault or a battery is not a negligent act, the "negligent act or omission" required to waive immunity under section 29-20-205 does not refer to the intentional tort.  When, therefore, there has been no showing of negligence by the governmental entity in supervision of one of its employees acting within the scope of employment, the exception to sovereign immunity set forth in section 29-20-205 will not apply.

- 10 -

*Id.* (citations omitted).[8]  Similarly, when an employee's actions constitute more than ordinary negligence, such as recklessness or gross negligence, immunity from suit is not removed under section 29-20-205.  *See Harp v. Metro. Gov't of Nashville*, No. M2012-02047-COA-R3-CV, 2014 WL 265713, at *3 (Tenn. Ct. App. Jan. 22, 2014).  Therefore, in addition to the requirements to successfully assert a claim for negligence under section 29-20-205, as with any negligence claim, the plaintiff must prove five essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause."  *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

In the present case, there are several critical facts that are undisputed.  The Shelby County Board of Education and Shelby County Schools are clearly "governmental entities" within the meaning of the GTLA.  *See* Tenn. Code Ann. § 29-20-102(3)(A).  Additionally, there is no dispute that Mr. Mosby was an employee of these entities at the time of the incident and was acting within the scope of that employment at the time Kenji was injured.  Further, the trial court explicitly stated that Defendants are not entitled to governmental immunity because Mr. Mosby's actions constituted ordinary negligence rather than an intentional tort, recklessness, or gross negligence.

At trial and on appeal, Defendants' only contention with the trial court's decision to deny their motion for involuntary dismissal relates to whether they are immune from suit under the GTLA.  As a result, rather than addressing all of the required elements for a negligence claim under the GTLA, our review will be limited to the issue of governmental immunity.  *See Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) (stating "[a]ppellate review is generally limited to the issues that have been presented for review"); *Bean*, 40 S.W.3d at 56 (stating "an issue is waived where it is simply raised without any argument regarding its merits").

### 1.  Intentional Torts – Assault and Battery

Defendants first assert that they are immune from suit under the GTLA because Mr. Mosby's actions constitute an assault or battery.  In addressing a case alleging assault, this Court "draw[s] upon the definition of assault in our criminal statutes and the cases interpreting it."  *Hughes*, 340 S.W.3d at 371.  Accordingly, criminal assault is defined as occurring when someone: "(1) [i]ntentionally, knowingly or recklessly causes bodily injury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative."  Tenn. Code Ann. § 39-13-101(a).  "This Court has defined the tort of battery as 'an

---

[8] Plaintiff's complaint did not include a claim for negligent supervision by Defendants.

intentional act that causes an unpermitted, harmful or offensive bodily contact.'" *Lacy v. Hallmark Volkswagen Inc. of Rivergate*, No. M2016-02366-COA-R3-CV, 2017 WL 2929502, at *4 (Tenn. Ct. App. July 10, 2017) (quoting *Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9-CV, 2001 WL 327906, at *4 (Tenn. Ct. App. Apr. 5, 2001)). Based on the Supreme Court's directive in *Hughes*, 340 S.W.3d at 370-71, and its subsequent cases, we find that Mr. Mosby did not commit an assault or battery in this case.

Under both the criminal and civil applications of assault, an assault does not take place unless the person intends to cause harmful or offensive contact with another or intends to create an apprehension of harm. *Hughes*, 340 S.W.3d at 370-71 (discussing *State v. Wilson*, 924 S.W.2d 648 (Tenn. 1996)). It is clear from the record that Mr. Mosby intended neither in this case. While the end result of Mr. Mosby throwing the shot put was tragic, he clearly testified that he did not intend to strike Kenji. His intent was not to cause Kenji or another student harm or to cause fear of getting injured by the shot put. Instead, he threw the shotput with the sole intention of demonstrating for the students how to properly throw the shot put. There is no evidence to indicate otherwise.

In their appellate brief, Defendants admit that Mr. Mosby did not intend to strike any of the students with the shot put. Yet, they vehemently assert that several prior cases involving assault and battery are analogous to the case at bar. We find these cases to be distinguishable to the facts at hand.

In *Saunders v. State*, a criminal defendant was convicted of assault and battery after firing a shotgun from the window of his home and hitting a victim. 345 S.W.2d 899, 900-01 (Tenn. 1961). At trial, the defendant testified that he did not intend to kill the victim when he fired the shotgun. *Id.* at 902. Regardless, the court upheld his conviction, holding that specific intent to cause harm was not necessary to constitute an assault and battery when the defendant acted with general malevolence or recklessness. *Id.* In contrast, Mr. Mosby throwing the shot put was not "*malum in se*," an act where an "injury is a natural or probable consequence of the act." *Id.* The natural result or consequence of hurling a shot put is to accomplish athletic achievement, not to frighten or injure another.

*State v. James*, No. 01C01-9505-CC-00132, 1995 WL 761316 (Tenn. Crim. App. Dec. 19, 1995), is also discussed by Defendants. In *James*, a jail inmate was convicted of assault after throwing a jar of hair grease out of his cell door and striking a security officer standing down a flight of stairs. *Id.* at *1-2. The inmate claimed that he did not intend to strike the officer with the jar and could not even see where the jar landed. *Id.* at *2. However, the court stated that "assault includes the intentional, knowing, or *reckless* causing of bodily injury to another." *Id.* (emphasis added) (citing Tenn. Code Ann. § 39-13-101). As a result, the court upheld the inmate's guilty verdict of assault for *recklessly* committing assault by throwing the jar. *Id.* As we will discuss below, we cannot say that Mr. Mosby acted recklessly when he threw the shot put. Therefore, the holding in *James*

- 12 -

is not applicable in the case before us.

Defendants also compare the facts in *Hughes*, 340 S.W.3d 352, to this case. Although their comparison is conclusory in nature, it bears discussing. In *Hughes*, an employee of the Nashville Public Works Department revved the engine of a front-end loader, startling the plaintiff who was nearby. *Id.* at 355. The plaintiff fell and suffered serious injuries as a result of the incident. *Id.* Unlike Mr. Mosby, in *Hughes*, the employee intended to frighten the plaintiff by engaging in "horseplay." *Id.* at 371. As a result, the Supreme Court determined that he committed the intentional tort of assault despite not intending to injure the plaintiff. *Id.* Again, there is no evidence in the present case that would suggest Mr. Mosby intended to frighten Kenji or another student by throwing the shot put. In the absence of such evidence, the facts in *Hughes* are not analogous to the present circumstances.

The results of Defendants' own investigation concluded that Mr. Mosby did not commit an intentional tort. The investigation resulted in a conclusion that Mr. Mosby *neglected* his duty as the track and field coach. Dorsey Hopson, II, the Superintendent of Shelby County Schools, adopted this finding. The investigation and subsequent findings did not mention an assault or battery by Mr. Mosby. Further, school officials in Tennessee are required to report a child's injury to the Department of Children's Services or to other appropriate authorities if it appears that the injury was the result of abuse, brutality, or neglect. *See* Tenn. Code Ann. § 37-1-403(a), (i). Yet, there is no indication that school officials reported the incident under this section. The absence of such a report indicates that Superintendent Hopson and Defendants by proxy did not believe Mr. Mosby committed an abusive act of assault or battery by accidently striking Kenji with the shot put. We also note that Mr. Mosby was not terminated but continued his employment through the remainder of the school year.

For these reasons, we agree with the trial court that Mr. Mosby did not act intentionally when he threw the shot put towards Kenji.

## 2. Recklessness

A person acts with reckless intent "when the person is aware of but consciously disregards a substantial and unjustifiable risk." Tenn. Code Ann. § 39-11-302(c); *see also Brown v. Hamilton Cty.*, 126 S.W.3d 43, 49 (Tenn. Ct. App. 2003). To be reckless, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-302(c); *see also Brown*, 126 S.W.3d at 49.

The circumstances and actions that led to a finding of recklessness in *State v. James* are not analogous to Mr. Mosby's in this case. In *James*, the defendant inmate knew that

- 13 -

an officer was standing nearby outside of his cell when he threw the jar of grease. *See James*, 1995 WL 761316, at *1-2. Unlike Mr. Mosby demonstrating proper technique in a sport, the inmate threw the jar out of frustration. *Id.* at *2. He took no precautions to ensure that the jar would not hit someone nearby. *See id.* He threw the jar out of his cell and towards the officer without any concern for the potential that doing so may injure others nearby. *Id.* Therefore, regardless of whether the inmate truly did not intend to strike the nearby officer, he disregarded the risk of hitting someone with the jar when he threw it out of his cell. *Id.* at *1-2. As a result, the court concluded that he acted recklessly. *Id.* at *2.

Based on the uncontroverted testimony of Mr. Mosby, we find that he did not *consciously disregard* a substantial risk when throwing the shot put towards the group of students. While his efforts were obviously futile, Mr. Mosby did make efforts to safely throw the shot put towards the students. He testified that he moved farther away from the students before throwing. Additionally, he stated that he verbally instructed and motioned for the students to also move farther away. After Mr. Mosby and the students moved farther apart, he estimated they were separated by approximately 35 to 40 feet, 10 to 15 feet farther than before they moved. Understanding that he could throw the shot put farther than the students, Mr. Mosby testified that he did not throw it as hard as he could. Taken together, the evidence shows that Mr. Mosby did not "consciously disregard" the risk of throwing the shot put. He made several efforts, albeit unsuccessfully, to limit the risk of harm.

In determining whether Mr. Mosby was reckless, his actions must also be viewed from his untrained perspective. *See* Tenn. Code Ann. § 39-11-302(c); *Brown*, 126 S.W.3d at 49. Mr. Mosby was not a seasoned expert in the sport of shot put. Although he participated in track and field in his youth, he was only vaguely familiar with shot put. Further, Mr. Mosby testified that he was not trained in shot put prior to Kenji being injured. Even as a coach, Mr. Mosby's experience was slim. He only worked at Geeter Middle School for one year, and the date of the incident was the first day of the track and field tryouts.

After considering Mr. Mosby's lack of experience and training, we find that his actions were not a gross deviation from the standard of care that a person in his circumstances would exercise. Mr. Mosby did not act recklessly when he distanced himself from the students, instructed them to move back, and threw the shot put with less than full force.[9]

---

[9] In her complaint, Plaintiff alleges that Mr. Mosby was negligent and reckless. Defendants argue that this statement is a judicial admission against Plaintiff, establishing that Mr. Mosby acted recklessly. "However, the inferences to be drawn from the facts or the legal conclusions as set forth in a complaint are not required to be taken as true." *Hurd v. Woolfork*, 959 S.W.2d 578, 581 (Tenn. Ct. App. 1997) (citing *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. App. 1992)). Additionally, an allegation of "reckless" conduct is a legal conclusion that is reviewed *de novo*. *See Eberbach v. Eberbach*, 535 S.W.3d at 473; *Hurd*, 959 S.W.2d at 581 (stating "the inferences to be drawn from the facts or the legal conclusions as set

### 3. Gross Negligence

Gross negligence is conduct that amounts to "a conscious neglect of duty or a callous indifference to the consequences." *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994) (quoting *Thomason v. Wayne Cty.*, 611 S.W.2d 585, 587 (Tenn. Ct. App. 1980)). Gross negligence is more than acting inadvertently. *See Conroy v. City of Dickson*, 49 S.W.3d 868, 871 (Tenn. Ct. App. 2001) (quoting *Odum v. Haynes*, 494 S.W.2d 795, 807 (Tenn. Ct. App. 1972)). To successfully assert a gross negligence claim, the party must "prov[e] that the defendant has committed a negligent act" and "must prove that the act was 'done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law.'" *Thrasher v. Riverbend Stables*, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *5 (Tenn. Ct. App. May 21, 2008) (quoting *Ruff v. Memphis Light, Gas, and Water Div.*, 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981)). "An act which otherwise would be nothing more than simple negligence may amount to gross negligence if the defendant's negligent conduct also involves a dangerous instrumentality." *Id.* at *6 (citing *Cook*, 878 S.W.2d at 938; *Phelps v. Magnavox Co.*, 497 S.W.2d 898, 906 (Tenn. Ct. App. 1972)).

Again, although Mr. Mosby failed to take the greatest precautions when he injured Kenji, he did not act with a "callous indifference" to potentially harming a student. *See Cook*, 878 S.W.2d at 938. Mr. Mosby's precautions, although minor, showed a concern for the safety of the students. Mr. Mosby also testified that as soon as he turned and released the shot put, he realized it was going to strike Kenji, so he yelled out for him to move. As soon as the shot put struck Kenji, Mr. Mosby ran to his aid. While Mr. Mosby inadvertently struck Kenji with the shot put, inadvertence on its own does not amount to gross negligence. *See Conroy*, 49 S.W.3d at 871.

In its order denying Defendants' motion for involuntary dismissal, the trial court found that Mr. Mosby acted negligently rather than intentionally, recklessly, or with gross negligence. For the reasons we have previously discussed herein, we agree. To the extent the trial court relied on Mr. Mosby's testimony in making this finding, its assessment of Mr. Mosby's credibility is not disturbed on appeal. *Hughes*, 340 S.W.3d at 360 (stating "[b]ecause trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary"). The events and decisions that led to Kenji being struck in the head by the shot put were fraught with questionable judgment. However, despite the questionable judgment and Kenji's serious injuries, Mr. Mosby's actions did not amount to gross negligence.

Because Mr. Mosby did not act intentionally, recklessly or with gross negligence

---

forth in a complaint are not required to be taken as true").

when Kenji was injured, Defendants are not immune from suit under the GTLA. Instead, we agree with the trial court that immunity has been stripped by the negligence of Mr. Mosby under Tennessee Code Annotated section 29-20-205. Accordingly, we affirm the trial court's decision to deny Defendants' motion for involuntary dismissal.

Based on our decision to affirm the denial of Defendants' motion for involuntary dismissal, the remaining issues raised by Plaintiff related to this motion are pretermitted.[10]

## B. Admitting Dr. Klimo's Deposition

Defendants argue that the trial court erred in admitting into evidence portions of the transcript from Dr. Klimo's deposition. Thirteen days before trial, Plaintiff filed her designation of deposition testimony for use at trial. Included in her designation were portions of the transcript from Dr. Klimo's deposition. Over Defendants' objection, the trial court allowed the deposition testimony to be read into evidence. Defendants argue that Plaintiff did not prove that Dr. Klimo was "unavailable" to testify as defined by Tennessee Rule of Evidence 804(a), so his deposition transcript could not be admitted under Tennessee Rule of Civil Procedure 32.01(3). We disagree.

Tennessee Code Annotated section 24-9-101 states that deponents such as "[a] practicing physician, physician assistant, . . . or attorney" are "exempt from subpoena to trial but [are] subject to subpoena to deposition." Tenn. Code Ann. § 24-9-101(a)(6). Rule 32.01(3) of the Tennessee Rules of Civil Procedure permits the use of a deposition transcript at trial if the witness is "unavailable," as defined by Tennessee Rule of Evidence 804(a). Tenn. R. Civ. P. 32.01(3). Rule 804(a) lists several situations in which a witness may be unavailable to testify. One situation includes the witness being "absent from the hearing and the proponent of a statement has been unable to procure the [witness's] attendance by process." Tenn. R. Evid. 804(a)(5).

Defendants' argument that the trial subpoena exemption under section 24-9-101 is not a ground for "unavailability" under Rule 804(a) is simply an erroneous statement of

---

[10] In Defendants' answer to Plaintiff's complaint, they asserted that they were immune from suit under the GTLA. However, the first time Defendants claimed that Mr. Mosby acted intentionally, recklessly, or with gross negligence was after Plaintiff presented her case-in-chief, which was three years after the injury. At oral argument on appeal, Defendants' counsel admitted that they did not submit a pleading prior to trial that suggested Mr. Mosby acted in such a fashion. To the contrary, throughout this case, Defendants placed the entirety of the blame on Kenji, claiming that he was at fault for failing to follow Mr. Mosby's directions. While Mr. Mosby was no longer an employee of Defendants at the time of trial, and he was never named as a defendant or represented by counsel for Defendants, this Court questions the sincerity of Defendants' apparent decision to forgo informing Mr. Mosby that they would allege he acted intentionally, recklessly, or with gross negligence. At trial, counsel for Defendants indicated that this argument and the *written* motion to dismiss was prepared several days before trial, indicating a premeditated decision to present the issue at the eleventh hour. This last-minute and suspect trial tactic raises concern with this Court. However, it is not an issue that warrants full discussion herein.

law. Time and again, this Court has held that the term "unavailable" under Rule of Evidence 804(a)(5) includes a deponent subject to the subpoena exemption under section 24-9-101. *See, e.g.*, *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793, at *4 (Tenn. Ct. App. Sept. 25, 2014) (citing *Cullum v. Baptist Hosp. System, Inc.*, No. M2012-02640-COA-R3-CV, 2014 WL 576012, at *3 (Tenn. Ct. App. Feb. 12, 2014)); *Citadel Invs., Inc. v. White Fox Inc.*, No. M2003-00741-COA-R3-CV, 2005 WL 1183084, at *9 (Tenn. Ct. App. May 17, 2005).

It is clear that Dr. Klimo is a "practicing physician" and therefore exempt from subpoena to trial under section 24-9-101(a). He is a licensed neurosurgeon in seven different states, including Tennessee. He has been a full-time neurosurgeon since 2010, currently performing surgeries at LeBonheur Children's Hospital in Memphis. His primary focus is pediatric neurosurgery. To no avail, Defendants argue that Plaintiff failed to satisfy the requirements of section 24-9-101(a) because they did not attempt to serve Dr. Klimo with a subpoena to trial. They claim that a party must attempt to serve the witness with a subpoena before the deposition can be admitted, regardless of whether the witness would inevitably exercise the exemption. There is no such requirement in Tennessee.

The facts related to this issue are analogous to those in *Citadel Invs. Inc. v. White Fox Inc.*, 2005 WL 1183084. In *Citadel Invs.*, a practicing attorney was deposed prior to trial. *Id.* at *8. The parties did not attempt to subpoena the attorney for trial, and the attorney did not appear to testify. *Id.* at *9. Regardless, the defendants in *Citadel Invs.* argued that the attorney's deposition should have been allowed to be admitted into evidence on the basis that he was "unavailable" under Rule 804(a). *Id.* This Court agreed, stating that "because he *could have* exercised his exemption as a practicing attorney under [section] 24-9-101," he was exempt from appearing to testify at trial and his deposition *should have* been admitted. *Id.* (emphasis added).

Dr. Klimo, just like the attorney in *Citadel Invs.*, was deposed but was not issued a subpoena to testify at trial. *See id.* at *8-9. As a practicing physician, Dr. Klimo was exempt from a trial subpoena regardless of whether he was actually served with a subpoena. *See* Tenn. Code Ann. § 24-9-101(a)(6); *Citadel Invs. Inc.*, at *11. Therefore, the trial court was correct in admitting Dr. Klimo's deposition transcript. He was "unavailable" to testify under Tennessee Rule of Evidence 804(a)(5) due to his statutory exemption, and because of his unavailability, Plaintiff was permitted to use his deposition transcript under Tennessee Rule of Civil Procedure 32.01(3).

### C. Dr. Wise's Expert Testimony

Prior to trial, Defendants filed a motion to exclude or limit Dr. Merrill Wise's testimony. The trial court denied this motion, finding that Dr. Wise's knowledge, experience, training, and education would assist the court and that the facts and data relied upon by Dr. Wise was trustworthy. On appeal, Defendants again argue that Dr. Wise is

not an expert in pediatric neurology and that his testimony should not have been admitted.

Tennessee Rules of Evidence 702 and 703 govern the admissibility of scientific proof. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 264 (Tenn. 1997). Rule 702 states, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. The facts relied upon by an expert may be learned by the expert at or prior to the final hearing. Tenn. R. Evid. 703. "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." *McDaniel*, 955 S.W.2d at 264 (quoting Tenn. R. Evid. 703). "In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel*, 955 S.W.2d at 263 (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)).

In accordance with Rule 702 and 703, a trial court applies five non-exhaustive factors in determining whether an expert's testimony is reliable and admissible:

> (1) whether [the] evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 455 (Tenn. 2015) (alteration and omission in original) (quoting *McDaniel*, 955 S.W.2d at 265). Courts are not required to rigidly apply these factors. *See id.*; *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 272-73 (Tenn. 2009). Instead, the two most important considerations are whether the testimony is reliable and whether it will substantially assist the trier of fact. *Payne*, 467 S.W.3d at 455. Once testimony is admitted, it is then "tested with the crucible of vigorous cross-examination and countervailing proof." *McDaniel*, 955 S.W.2d at 265.

After a thorough review of the record, we agree that Dr. Wise was qualified to testify as a medical expert under Rules 702 and 703. Dr. Wise is a licensed medical doctor in three different states, including Tennessee, and specializes in pediatrics. In the past, he worked first-hand as a child neurologist, treating patients with a wide range of neurological issues, including those that stem from head trauma. He has also held faculty positions at Baylor College of Medicine and the University of Alabama at Birmingham School of Medicine, focusing on neurology. While employed at Baylor College, he held a subspecialty in sleep neurophysiology and epilepsy. Currently he practices in Memphis as a specialist in sleep medicine. Although he is not certified in neurosurgery, he has maintained his board certification in child neurology. As a child neurologist, he testified

- 18 -

that it is within his training and expertise to evaluate issues in this case, such as Kenji's susceptibility to future headaches as a result of the incident. Additionally, before forming his opinions in this case, Dr. Wise reviewed Kenji's medical records and performed an independent medical evaluation.

Dr. Wise was also qualified to testify on Kenji's medical bills. To be qualified to give opinions on the necessity and reasonableness of medical bills, the testifying physician must exhibit: "(1) knowledge of the party's condition, (2) knowledge of the treatment the party received, (3) knowledge of the customary treatment options for the condition in the medical community where the treatment was rendered, and (4) knowledge of the customary charges for the treatment." *Dedmon v. Steelman*, 535, S.W.3d 431, 438 (Tenn. 2017) (quoting *Long v. Mattingly*, 797 S.W.2d 889, 893 (Tenn. Ct. App. 1990)).

When applied to Dr. Wise in this case, the factors show that he was qualified to testify on Kenji's medical bills. Through the independent medical exam, the review, and his background in neurology, Dr. Wise was familiar with the surgery and subsequent treatment rendered to Kenji as a result of the incident. Dr. Wise testified that he was also familiar with the treatment options for a depressed skull fracture in the Memphis area. To his knowledge, he did not know of any alternatives to surgery and the subsequent follow-up rendered to Kenji for his injury. Instead, he testified that the surgery to repair Kenji's depressed skull fracture is the accepted approach. Finally, he testified that he was familiar with the usual and customary charges in the Memphis area for the medical services in this case. He testified that his familiarity with the charges was based on his training and experience as a child neurologist. Although he has never practiced as a neurosurgeon, he has worked and consulted with neurosurgeons.

Based on Dr. Wise's background, knowledge, and experience, the trial court found that the underlying facts and data relied upon by Dr. Wise were reliable and that his testimony would assist the court in determining the factual issues of the case. Acting as the "gatekeeper" of evidence, the trial court did not abuse its discretion in deciding whether to allow Dr. Wise to testify with no limitations. *Payne*, 467 S.W.3d at 455 (quoting *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005)); *Mabry*, 458 S.W.3d at 909.

### D. Admitting Plaintiff's Medical Bills

As we stated in the previous section, Dr. Wise was qualified to testify on the medical bills that Plaintiff incurred on behalf of Kenji. In addition to the arguments previously discussed, Defendants also contend that these medical bills were improperly admitted.

At the outset of this discussion, we note that Defendants do not dispute that the medical bills were reasonable. In personal injury actions, Tennessee Code Annotated section 24-5-113(b) details the procedure for establishing a rebuttable presumption that medical bills of $4,000 or greater are reasonable. *See* Tenn. Code Ann. § 24-5-113(b)

(stating "if an itemization of or copies of the medical, hospital or doctor bills . . . are served upon the other parties at least ninety (90) days prior to the date set for trial, there shall be a rebuttable presumption that such medical, hospital or doctor bills are reasonable"). Prior to trial, Plaintiff satisfied the requirements of section 24-5-113(b), and there is nothing in the record to indicate that Defendants attempted to rebut the presumption. The trial court found that Plaintiff was entitled to a presumption that the medical expenses incurred on Kenji's behalf are reasonable. Defendants were prohibited from presenting evidence to rebut this presumption, and they do not attempt to argue otherwise on appeal. Instead, they argue that the medical bills were improperly admitted because they were not properly authenticated by Dr. Wise and because Plaintiff did not show that the bills were necessary.

"For [past medical expenses], a plaintiff must prove that the medical bills paid or accrued . . . were both 'necessary and reasonable.'" *Dedmon*, 535 S.W.3d at 438 (quoting *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009)). "In all but the most obvious and routine cases, plaintiffs must present competent expert testimony to meet this burden of proof." *Id.* "A physician who is *familiar* with the extent and nature of the medical treatment a party has received may give an opinion concerning the necessity of *another physician's services* and the reasonableness of the charge." *Id.* (emphasis added) (quoting *Long*, 797 S.W.2d at 893).

Defendants rely on Tennessee Rule of Evidence 901 for the assertion that Dr. Wise's testimony did not authenticate the medical bills incurred by Plaintiff. Rule 901 states that, in order to be admitted, evidence must be properly authenticated or identified. Tenn. R. Evid. 901(a). Rule 901 also states that a witness with knowledge of the evidence may satisfy the authentication requirement by testifying that the evidence "is what it is claimed to be." Tenn. R. Evid. 901(b). On appeal, Defendants appear to argue that only a plaintiff or treating physician can authenticate medical bills and that Dr. Wise did not have firsthand knowledge to testify on the bills. This assertion is a clear misstatement of settled law.

The Supreme Court in *Long v. Mattingly* clearly stated that a physician must be *familiar* with the medical treatment provided by *another* physician in order to testify on the resulting medical bills. *See Dedmon*, 535 S.W.3d at 438 (quoting *Long*, 797 S.W.2d at 893). As long as the testifying physician meets the qualification requirements stated in *Long*, the physician may testify on the reasonableness and necessity of medical charges, regardless of whether he or she rendered the services. *See id.* As we explained above, Dr. Wise satisfied the requirements of *Long* and was, therefore, qualified to testify on the medical bills that Plaintiff incurred.

Dr. Wise and Dr. Klimo (the treating physician) both testified that the medical services provided for Kenji were necessary. Plaintiff stresses Kenji's injuries were so obvious and extreme that this was a "routine case," and as a result, that she was not required to present competent expert testimony on his medical expenses. *See id.* (quoting *Borner*, 284 S.W.3d at 218). We need not address this issue. Dr. Wise's and Dr. Klimo's testimony

- 20 -

on the necessity of medical services provided to Kenji satisfied Plaintiff's burden of proof.

The medical bills that Plaintiff incurred on behalf of Kenji were proven to be necessary and reasonable. As a result, we affirm the trial court's decision to admit the medical bills at trial.

### E. Comparative Fault

Defendants also argue that they rebutted the presumption that Kenji had no capacity for negligence and, as a result, comparative fault should be applied against him.

Under standard modified comparative fault principles, "so long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover." *Mann v. Alpha Tau Omega Fraternity*, 380 S.W.3d 42, 46 (Tenn. 2012) (quoting *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992)). If the plaintiff was also negligent, the "plaintiff's damages are to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff." *Id.* However, this system is modified when a child is the plaintiff in a negligence action.

"In a negligence action where a child is a plaintiff and the defense of comparative negligence is raised, the 'Rule of Sevens' is used to determine the extent to which the child's negligence, if any, would reduce the child's recovery." *Durham ex rel. Durham v. Noble*, No. M2011-01579-COA-R3-CV, 2012 WL 3041296, at *3 (Tenn. Ct. App. July 25, 2012) (citing *McGlothin v. Bristol Obstetrics, Gynecology & Family Planning, Inc.*, No. 03A01-9706-CV-00236, 1998 WL 65459, at *5 (Tenn. Ct. App. Feb.11, 1998); *Roddy v. Volunteer Med. Clinic*, 926 S.W.2d 572, 576 (Tenn. Ct. App. 1996); *Cardwell v. Bechtol*, 724 S.W.2d 739, 749 (Tenn. 1987)). The Rule of Sevens is applied in three scenarios involving a minor plaintiff: (1) if the child is under seven, the child has no capacity for negligence; (2) if the child is between ages seven and fourteen, there is a rebuttable presumption that the child *does not* have the capacity for negligence; and (3) if the child is ages fourteen to majority, there is a rebuttable presumption that the child *does* have the capacity for negligence. *Crockett v. Sumner Cty. Bd. of Educ.*, No. M2015-02227-COA-R3-CV, 2016 WL 6995483, at *5 (Tenn. Ct. App. Nov. 30, 2016) (citing *Cardwell*, 724 S.W.2d at 745; *Durham*, 2012 WL 3041296, at *3). Whether a child has the capacity for negligence under the final two scenarios "is to be judged in the light of [the child's] age, ability, intelligence, training and experience and the complexity of the danger with which he is confronted." *Id.* (quoting *Cardwell*, 724 S.W.2d at 748). Whether a minor has the capacity for negligence is a question of fact. *Durham*, 2012 WL 3041296, at *3. Therefore, in bench trials, the trial court's findings on whether a child has the capacity for negligence is reviewed *de novo* with a presumption of correctness. *See* Tenn. R. App. P. 13(d); *Barnes*, 193 S.W.3d at 498.

At the time the incident occurred on January 27, 2016, Kenji was twelve years old.

In its answer and throughout this case, Defendants alleged that comparative fault should be assessed against Kenji. As a result, the Rule of Sevens applies with the rebuttable presumption that Kenji, as a twelve-year-old, did not have the capacity for negligence. *See Crockett*, 2016 WL 6995483, at *5; *Durham*, 2012 WL 3041296, at *3.

Viewing the circumstances in light of Kenji's youthful perspective, we find that Defendants did not rebut the presumption that Kenji did not have the capacity for negligence at the time of the incident. It appears undisputed that Kenji is a successful athlete and a bright child. He has always received good grades in school, consistently earning As and Bs. Mr. Mosby described him as a "good kid" and a good student. Although Kenji has been involved in sports such as football and basketball since he was a young child, he testified that the date of the incident was the first time he was exposed to the shot put exercise. Kenji also testified, and the trial court found, that before the tryouts began, Mr. Mosby did not explain safety rules or the risk of injury by getting hit with a shot put. Additionally, there is no proof that indicates Kenji disregarded any of Mr. Mosby's instructions. Instead, Kenji stated that he did not hear Mr. Mosby instruct the students to move back and did not see the other students move away from Mr. Mosby. Kenji's unfamiliarity with the shot put exercise and his unawareness of its danger is distinguishable from prior cases where the Rule of Sevens presumption was rebutted.

In *Durham ex rel. Durham v. Noble*, an eleven-year-old child was struck by a school bus while riding his bicycle. *Durham*, 2012 WL 3041296, at *1, *4. Prior to being injured by the school bus, the child lived in the neighborhood for approximately two years and frequently rode his bicycle throughout the neighborhood. *Id.* at *4. Prior to being injured, the child was taught to stop and look both ways when crossing the street, even when riding a bicycle. *Id.* As a result of the child's familiarity in riding a bicycle in the neighborhood, and his familiarity with the safety rules of the road, this Court found that the presumption that he did not have the capacity for negligence was rebutted. *Id.*

Similarly, in *Crockett v. Sumner Cty. Bd. of Educ.*, a thirteen-year-old child was injured after falling off of bleacher seats. *Crockett*, 2016 WL 6995483, at *1, *6. The child frequently used the bleacher seats as steps despite knowing that he was not supposed to walk across the seats. *Id.* at *6. The testimony in *Crockett* showed that multiple witnesses informed the child on several occasions to use the stairs rather than the steps to traverse the bleachers. *Id.* Taken together, this Court found that the child understood the risks and potential consequences of using the seats as steps. *Id.* As a result, this Court affirmed the conclusion that the defendant rebutted the presumption that the child did not have the capacity for negligence. *Id.*

Unlike the minor children in *Durham* and *Crockett*, who were familiar with and experienced in the activities that caused their injuries, Kenji was unfamiliar with the risks and safety procedures for the shot put exercise. Kenji's success and knowledge in other sports did not equip him with an understanding of or familiarity with shot put. Although

he is a bright child and a successful student, taken together, the facts show that he did not have the capacity for negligence.

After considering all of the underlying circumstances, we agree with the trial court that Defendants did not rebut the presumption that Kenji did not have the capacity for negligence. As a result, we affirm its decision to hold that Defendants are solely at fault for Kenji's injuries.

## F. Damages

On appeal, in addition to the issues raised by Defendants, Plaintiff asserts that the trial court erred in awarding her only $200,000 in compensatory damages. She claims that the $200,000 award does not sufficiently compensate her for Kenji's injuries and medical bills. Instead, she requests an award to the full extent allowed under the GTLA.

Previously, our supreme court has detailed the rules that govern a plaintiff's claim for damages in a personal injury action:

> "A person who is injured by another's negligence may recover damages from the other person for all past, present, and prospective harm." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 267 (Tenn. 2015) (quoting *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287-88 (Tenn. Ct. App. 2012)). "An award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury caused by a defendant's wrongful conduct." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013) (citing *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975)). "The party seeking damages has the burden of proving them." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999).

> A plaintiff who is injured by another's negligence is entitled to recover two types of damages: economic (or pecuniary) damages and non-economic (or personal) damages. *Meals*, 417 S.W.3d at 419-20. Economic damages include past medical expenses, future medical expenses, lost wages, and lost earning potential. *Id.* at 419. A plaintiff may seek recovery for all "economic losses that naturally result from the defendant's wrongful conduct." *Id.*

> "Non-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life." *Id.* at 420 (quoting *Elliott v. Cobb*, 320 S.W.3d 246, 247 (Tenn. 2010)). Non-economic damages are often highly subjective and are not susceptible to proof by a specific dollar amount. While there must be some evidence to justify the

amount awarded, plaintiffs are not required to prove the monetary value of non-economic damages because such injuries are not easily quantified in economic terms. For this reason, the trier of fact is given broad latitude in fixing the monetary amount of non-economic damages.

*Dedmon*, 535 S.W.3d at 437-38 (footnote omitted).

Unless otherwise waived, the maximum amount allowed to be collected by a plaintiff who brings suit under the GTLA is $300,000.00. *See* Tenn. Code Ann. §§ 29-20-403(b)(4), -403(c), -404(a). In cases tried solely by the trial court and without a jury, this Court reviews the amount of damages awarded *de novo* with a presumption of correctness. *Moody*, 83 S.W.3d at 751. The amount of damages awarded is a question of fact, *id.*, but the measure of damages is a question of law that is reviewed *de novo*. *Poole*, 337 S.W.3d at 789. Accordingly, "[t]his Court will modify a trial court's award of damages based on the proper measure only if the evidence preponderates against the amount of damages awarded." *Id.*

In the present case, the trial court awarded Plaintiff $200,000 in compensatory damages. The court awarded Plaintiff the full amount of $63,858.69 for her past medical expenses. The trial court's final order does not mention future medical expenses, lost wages, or lost earning potential. By the court's omission, it can be assumed the remaining $136,141.31 in compensatory damages was awarded as non-economic damages.[11] As part of its award for Plaintiff's past medical bills, the trial court found that the bills were reasonable, consistent with customary charges for similar treatment in Memphis, and incurred as a result of necessary medical treatment. For the reasons that we have already discussed, we agree.

Although Plaintiff may disagree with the amount of damages awarded by the trial court, we find that the court properly applied the correct measure of damages. In its own purview, the trial court considered the relevant evidence related to Kenji's pain and suffering, any permanent impairment or disfigurement, and any loss of enjoyment of life.

In its final order, the trial court detailed several facts that related to Kenji's pain and suffering directly after and well beyond being struck by the shot put. The court found that, after being struck by the shot put, Kenji suffered a depressed skull fracture, requiring surgery, and experienced severe pain and discomfort in his head and the right side of his body. The court also stated that Kenji's severe pain continued throughout his stay at the hospital, with only a slight reprieve in severity after surgery. The trial court also considered the headaches, dizziness, and recurring tenderness at the site of his surgical incision that Kenji reported after being discharged from the hospital. While Kenji reportedly continues

---

[11] It is evident from the parties' briefs that they agree the trial court awarded Plaintiff $63,858.69 in economic damages for Kenji's medical expenses.

to suffer headaches, the trial court noted that this issue was questionable, but that he was still experiencing some pain and suffering.

Kenji's initial and ongoing anguish and worry was also thoroughly discussed by the trial court. The trial court noted Kenji's statements in the hospital about fearing death, fearing that he would not be able to play sports again, and being nervous about the surgery. The court considered Kenji's nightmares about the accident that he experienced at the hospital and since being discharged. In its order, the court stated that the nightmares continue to occur, but that they are less frequent.

As to loss of enjoyment of life, the trial court noted that Kenji continued to receive good grades after the incident and has returned to an otherwise normal routine. The court considered his temporary loss of enjoyment of life in the initial months following the accident, but noted that Kenji has resumed all activities, including football.

Plaintiff asserts that the trial court did not properly consider Kenji's permanent impairment or disfigurement, particularly Kenji's reported brain damage and scarring. In the court's oral ruling—which was incorporated into its final order—the court listed several of the elements of non-economic damages. Although the trial court did not specifically list permanent injury, disfigurement, or scarring in its oral statement of non-economic damages, its subsequent findings clearly indicate that these elements were considered. In particular, the court noted that, although Kenji is self-conscious of the scar on his scalp and the residual depression of his skull, neither are visible because Kenji's hair currently covers the area. Additionally, the court noted that CT scans of Kenji's brain indicated areas of bruising or scarring to his brain, which was caused by the shot put's impact. Dr. Wise and Dr. Klimo testified that the bruising or scarring indicated permanent brain damage. The court did not disregard this testimony. Instead, it stated that Kenji's permanent brain damage did not appear to be worrisome since he was released for sports without limitations, including football. As a result, the court did not place significant weight on the issue.

Again, we find that the court applied the proper measure of damages to the facts of this case. *See Poole*, 337 S.W.3d at 789. The facts do not preponderate against the amount of damages awarded. Although Plaintiff may be dissatisfied with the amount of damages awarded by the trial court, that is not the standard by which this Court reviews an award for non-economic damages. "Assigning a compensable, monetary value to non-economic damages can be difficult. The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred." *Meals*, 417 S.W.3d at 420 (citation omitted). Plaintiff may place more weight on the severity of some of Kenji's injuries, but the trial court properly considered the elements of non-economic damages in measuring and awarding damages in this case.

Based on the foregoing discussion, we affirm the trial court's award of damages to

Plaintiff in the amount of $200,000.

## V. CONCLUSION

For the reasons stated herein, the decisions of the circuit court are hereby affirmed and remanded.  Costs of this appeal are taxed equally to the appellants, Shelby County Board of Education and Shelby County Schools, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE